**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-2073
_____

CRAIG A. GENESS,

Appellant

v.

JASON COX

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2:16-cv-00876)
Honorable Mark A. Kearney, U.S. District Judge

_____

Argued: January 19, 2018

Before: SMITH, *Chief Judge*, GREENAWAY, JR., and
KRAUSE, *Circuit Judges*

(Opinion Filed: August 28, 2018)

Joel S. Sansone [Argued]
Massimo Terzigni
401 Liberty Avenue, Suite 1700
Three Gateway Center
Pittsburgh, PA 15222

*Attorneys for Appellant Craig A. Geness*

April L. Cressler
Paul D. Krepps
Marshall Dennehey Warner Coleman & Goggin
501 Grant Street
Union Trust Building, Suite 700
Pittsburgh, PA 15219

Carol A. VanderWoude [Argued]
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103

*Attorneys for Appellee Jason Cox*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

In a tragic case that suggests systemic deficiencies at the juncture of Pennsylvania's criminal justice and mental health systems, the Appellant in this case—an adult with mental retardation and other mental illness—was charged for

a crime that may not have occurred and was then detained for nearly a decade awaiting trial, even though it was determined early in the proceedings that he was incompetent and unlikely to improve. With fault shared among the Uniontown Police Department, the Fayette County Public Defender's Office and later, private counsel, the Fayette County District Attorney's Office, the Court of Common Pleas of Fayette County, and the mental health infrastructure of Pennsylvania, Craig Geness's criminal case was inadequately investigated, inadequately defended, and inadequately monitored and supervised as Geness languished in various detention facilities. All the while, his petition for habeas relief remained pending. And when a hearing was finally held on that petition, the District Attorney's Office voluntarily dismissed the charges out of concern for its "ability to meet its burden of proof, even if the defendant were competent." App. 205a.

This appeal arises from Geness's subsequent lawsuit against the arresting officer, then-Detective Jason Cox,[1] and various other defendants, claiming they violated his civil rights through reckless investigation, false arrest, false imprisonment, and malicious prosecution, in violation of 42 U.S.C. § 1983, and that they denied him due process and violated the Americans with Disabilities Act ("ADA"), 42

---

[1] Appellee Jason Cox is now Chief of Police for the Uniontown Police Department. Simply for ease of reference, and without intending any disrespect to the parties, we will refer to former-Detective Cox and Mr. Geness as simply "Cox" and "Geness."

U.S.C § 12131.  But at this point—nearly a dozen years after Geness's arrest and with the performance of his various counsel marred by inexcusable delays and dilatory discovery efforts—most avenues of relief are now closed to him.  For the reasons explained below, we will affirm the District Court's dismissal of Geness's § 1983 claims but will reverse its denial of leave for Geness to amend his complaint and will remand for him to reinstitute his due process and ADA claims against the Commonwealth.

## I.  Background

### A.  The Incident at the McVey Personal Care Home

In 2006, Craig Geness lived at the McVey Personal Care Home, an assisted living facility for intellectually disabled people, in Uniontown, Pennsylvania.  In October of that year, another resident, Ronald Fiffik, fell from the front porch of the building and sustained serious injuries.  Hearing the resulting commotion, James McVey, the son of the owner and the supervisor then on duty, walked out to the porch to find Fiffik lying on the ground.  He called for an ambulance, informing the dispatcher that a resident had fallen, and Fiffik was taken by an emergency medical services ("EMS") unit to Uniontown Hospital where he was treated before being discharged to the McVey Home later that day.  That evening, however, Fiffik's pain intensified and he returned to the hospital where his condition continued to deteriorate, ultimately resulting in his death a few weeks later.

Three contemporaneous records from the day of the incident indicated that Fiffik had merely fallen in an

4

unfortunate accident. First, the initial EMS record noted that the ambulance was dispatched "in response to a fall" and also reflected that Fiffik's wife had witnessed the incident and that she "stated that [Fiffik] walked out on porch and fell down approx[.] 5 steps head first." App. 193a. Next, a Uniontown police officer who responded to the scene filled out an incident report, stating that a "[c]aller . . . reported that a male fell off of a porch" and that the officer took "[n]o further police action . . . [because] no one onscene [*sic*] could provide[] any information as to what happened other than [that] Fiffik fell off of the porch." App. 140. Finally, Fiffik's hospital admission records reflected that Fiffik was "alert, cooperative in no distress," that his "chief complaint" was that he "FELL," that he reported he "fell down approximately five stairs[,] . . . [h]as [mental retardation] and is unsteady and is not supposed to go near the stairs but he did and then he fell down them. It was witnessed. No loss of consciousness. Patient says he feels fine and he wants to go home." App. 171.

Notwithstanding these reports by Fiffik and his wife, once Fiffik's condition deteriorated to the point that he was on life support, his daughter reached out to the Uniontown Police Department to report her suspicion that her father might have been shoved. As a result, on November 16, 2006, Cox conducted a one-day investigation, which involved speaking to Fiffik's daughter and hospital personnel, interviewing James McVey, and then interviewing and obtaining a confession from Geness. Soon thereafter, Cox swore out a criminal complaint against Geness for aggravated assault, later upgraded to murder.

5

In his November 16th interview, with the prospect of a personal injury lawsuit, if not wrongful death suit looming, McVey reported for the first time that immediately prior to Fiffik's fall he heard Geness scream "shut up" from nearby and then saw Geness walk quickly inside to his bedroom. App. 141. McVey also said he then followed Geness to his room and asked if he pushed Fiffik, but Geness did not answer and instead "responded by laying in a fetal position on the bed." *Id.* In addition, McVey reported, again for the first time, that during the brief interlude between Fiffik's return to the McVey Home and his being readmitted to the hospital, Fiffik had told McVey that "someone" pushed him. App. 143.

With Geness now a suspect in an alleged crime, Cox proceeded to interview him. At that point, for reasons not apparent from the record, Geness had been transferred from the McVey Home to the Highlands Hospital where he had been admitted in the past and was then living as an in-patient. According to Cox's report, he had Geness brought to a room to meet with him, read Geness his *Miranda* warnings, and asked if Geness would speak with him concerning "the day that Ronald Fiffick fell from the wall." App. 141. Once Geness agreed and signed the *Miranda* waiver, Cox asked him the date, the day of the week, if he had gone to high school, and who was President of the United States. Geness correctly answered these questions and then, according to the report, provided a confession closely tracking McVey's account of events. That is, he admitted that on the day Fiffik was injured, Fiffik "said something" to him; he then "screamed at Fiffik 'Shut Up'" and "voices inside his head told him to push Fiffik over the wall"; and he "shoved Fiffik hard . . . went up to his bedroom, and shut the door." *Id.*

6

In his Affidavit of Probable Cause in support of the arrest warrant, Cox recounted James McVey's allegations against Geness and Geness's confession, and on that basis, a magisterial district judge issued a warrant for Geness's arrest. From that point forward, according to the affidavit he filed in support of his motion for summary judgment in the District Court, Cox "no longer maintained an active role in the prosecution of Mr. Geness," "heard very little from the prosecution regarding this case for approximately seven years," "did not have any role in the subsequent decision making in the prosecution," and "was never contacted by [the] Public Defender . . . or [Geness's private counsel] for information relating to [his] investigation . . . ." App. 165. Also according to that affidavit, Cox did not reference the exculpatory evidence in the EMS report and the hospital admission records in his Affidavit of Probable Cause because he "ha[d] no recollection of ever having seen [them] prior to the filing of this lawsuit," and to obtain them, he would have required a search warrant, which he also "ha[d] no recollection of ever having obtained." App. 164.

Upon his arrest, Geness was taken into custody, where, between Fayette County Prison and a locked-down mental institution, he would remain for over nine years without any further investigation, a hearing on his habeas petition, or a trial.

### B. Geness's Incarceration and Eventual Civil Commitment

The administration of justice went awry for Geness from the outset. After he was arraigned in November 2006,

7

Geness did not receive a preliminary hearing in magisterial district court for over five months. The Public Defender filed a habeas motion in the Court of Common Pleas of Fayette County in June 2007, asserting that Geness's confession was obtained in violation of his constitutional rights and that Cox lacked probable cause to arrest. Yet that motion was not ruled upon as Judge Leskinen, to whom the case was assigned, opined that Geness was "not at the present time competent to stand trial," App. 147, and the Defender agreed to continue any hearing on the petition "until [d]efendant is competent," App. 148. Pursuant to Section 402 of the Pennsylvania Mental Health Procedures Act, 50 Pa. Cons. Stat. Ann. § 7402, Geness was ordered to be transferred to Mayview State Hospital, for no more than 60 days, to receive a psychiatric evaluation.

That transfer, however, was not carried out, and almost two months later, the court issued a second order for a psychiatric examination to be performed. Still no action was taken. Finally, in September 2007, nearly ten months after Geness's arrest and after yet a third order was issued, Geness received his first examination. He was diagnosed by a psychiatrist with the Psychiatric Forensic Center at Mayview State Hospital with mild mental retardation with an IQ of 51 and schizoaffective bipolar disorder, and was found "incompetent to stand trial" because he was unable "to understand the concept of trial," App. 194, or "to recognize the role of personnel in the court system . . . [or the] various outcomes from his pending charges," App. 198. His prognosis for improvement was deemed "poor." App. 197.

Notwithstanding that prognosis, however, Judge Leskinen merely instructed counsel to request a hearing on

8

the habeas petition "at such time as def. is deemed competent to proceed," App. 148, and it appears that neither the Public Defender, nor the DA's Office, nor the court paid particular heed to the case again for another three years. Instead, Geness was returned to prison where he remained until November 2010.

At that point, for reasons not apparent from the record, the Public Defender requested that the court order Geness's involuntary commitment and residential treatment. In response, Judge Leskinen ordered a second psychiatric examination, noting that upon "a report containing a determination that the def. would not regain competency within a reasonable period of time . . . upon motion of counsel, the Court will schedule an additional hearing on that issue." App. 149.

Still, the cycle of indifference continued. This second examination was inexplicably delayed for nearly a year, and in the interim, counsel took no action.[2] And even after the examination was completed and concluded (as the court had anticipated) that Geness remained incompetent and was "not likely to respond to any additional treatment interventions," App. 203, Geness's counsel did not request a hearing on his long-pending habeas petition, nor did the prosecutor or the court raise the matter. Instead, in September 2011—five years after Geness's arrest and with his criminal charges still

---

[2] Geness was ordered evaluated at Torrance State Hospital, but apparently on account of space constraints, the assessment eventually took place at Fayette County Prison.

9

pending—Judge Leskinen ordered him transferred to involuntary commitment in a long term structured residence ("LTSR") where he would be fitted with an ankle monitor and would "remain without contact with the general public." App. 151. He further ordered that Geness be returned to Fayette County Prison "upon completion" of his civil commitment or upon "a determination that he is competent to stand trial, whichever comes first." App. 151.

In March 2012, Geness had a change of counsel but, sadly, no change of fortune. According to the affidavit his new counsel, Bernadette Tummons, filed in connection with the underlying summary judgment proceeding, she made numerous and repeated discovery requests of the District Attorney's Office over a two-year period that were simply ignored. Tummons, however, opted not to seek the court's intervention because she was concerned that "doing so would have flaunted [*sic*] the common practice of Fayette County . . . , would not have been successful, and would have assuredly soured [her] already tenuous relationship with the Office of the District Attorney." App. 331.

In June 2014, Tummons received a limited document production, including Cox's affidavit and the Public Defender's omnibus pretrial motion that asserted the confession was illegal. Those documents prompted her to think Geness's *Miranda* waiver and confession might not have been voluntary. By her account, when she next met with Geness, he told her he confessed because "the police told him [to say] that he pushed Mr. Fiffik." App. 332. Rather than acting on this information, however, Tummons opted to await further discovery, if forthcoming, from the DA's Office. In fact, she waited nearly another year before filing her first of

10

three motions to compel in May 2015. Contrary to her earlier assumption, all were successful. In September 2015, with the additional support in the psychiatric reports for her hypothesis that the confession was involuntary, Tummons filed a motion to dismiss the indictment and renewed motion for habeas relief.

### C.    The Hearing on Geness's Motions

Two months later, nearly nine years to the day after his arrest, Geness finally received a hearing in the Court of Common Pleas. Unsurprisingly, the DA's Office advised the court that it did not intend to proceed to trial as it anticipated it would be "unable to prove the case," App. 174, and the court agreed, noting that "if there is a reasonable possibility that the decedent just fell then it would be impossible for the Commonwealth to prove the case beyond a reasonable doubt," App. 177. But despite those observations and the protracted proceedings in this case, Judge Leskinen declined to reach the merits of Geness's motion to dismiss or his habeas petition, instead inviting the Commonwealth to abandon the charges by submitting a request for *nolle prosequi* ("*nol pros*"), and advising he would just "sign it" if submitted. App. 177-78. As the court observed, that approach would "moot consideration of [the] Motion for Habeas Corpus." App. 187.

The DA's Office readily agreed that it would "rather be in a position to present the Nol Pros today," *id.*, and thus, over the repeated objection of Tummons, the court postponed ruling on Geness's motions. The court also rejected Tummons's entreaty that it at least require the prosecutor to put "the reasons for the *nol pros* . . . on the record," but it did

11

instruct the prosecutor to include those reasons "in the *nol pros* when he brings it up." App. 189. And when it did—not that day as promised, but two weeks later—the DA's office acknowledged its reason was not only that the "Commonwealth believes that the defendant is and remains incompetent for trial," but also that there were "substantive evidentiary issues in this matter that likely could and would impair the Commonwealth's ability to meet its burden of proof, even if the defendant were competent." App. 205a.

When it came to entering the *nol pros* order, however, the court declined to mention the prosecution's inability to sustain its evidentiary burden, referencing only Geness's incompetence. And although not argued or requested by the prosecution, the court *sua sponte* offered its opinion that "there was clearly sufficient probable cause to file the criminal complaint and to pursue the matter," App. 191, and that the charges, which it dismissed "without prejudice," "may be refiled in the event evidence justifying such refiling is developed and discovered," App. 193.

In mid-December 2015, Geness was finally released.

### D.     Proceedings in the District Court

In June 2016, represented by his third and current attorney, Geness filed a complaint against Cox, James McVey and his parents (the owners of the McVey Home), the County of Fayette, and the City of Uniontown. As relevant to this appeal, he asserted claims for malicious prosecution, false arrest, false imprisonment, and reckless investigation, in violation of 42 U.S.C. § 1983, and claims for violation of due process and the ADA.

12

Ruling on the defendants' motion under Rule 12(b)(6), the District Court dismissed Geness's malicious prosecution claim on the ground that the *nol pros* order, by its terms, did not satisfy the element of "favorable termination" of the charges against him. Sometime thereafter, realizing he had erroneously filed his ADA and due process claims against the City of Uniontown and the County of Fayette instead of the Commonwealth, Geness sought leave to amend. But the District Court denied that request, reasoning that amendment would be futile because the ADA claim also would be barred under the *Rooker-Feldman* doctrine as "a direct challenge to a state court's orders and judgments." *Geness v. Cox*, No. 16-876, 2017 WL 1058826, at \*4 (W.D. Pa. Mar. 21, 2017).

With Geness having voluntarily dismissed all defendants but Cox, the parties proceeded with discovery. And once that was completed, the District Court granted summary judgment on Geness's reckless investigation, false arrest, and false imprisonment claims, concluding that Geness "fail[ed] to adduce evidence sufficient to proceed to trial" on any of them, and that the claims were also barred by the applicable two-year statute of limitations.[3] *Geness v. Cox*,

---

[3] The District Court also granted summary judgment on Geness's state law claim for intentional infliction of emotional distress on both statute of limitations and sufficiency of the evidence grounds. We need not dwell on this claim, however, as Geness does not challenge the ruling that it is time-barred on appeal, and, regardless, Geness did not present evidence that he suffered "some type of resulting physical harm due to the defendant's outrageous conduct," as

13

No. 16-876, 2017 WL 1653613, at \*4 (W.D. Pa. May 1, 2017).

## II.    Standard of Review[4]

We exercise plenary review over a district court's dismissal of claims under Rule 12(b)(6), *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014), accepting the complaint's factual allegations as true and construing them in the light most favorable to the nonmoving party, *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790, 793 (3d Cir. 2016). We also review a district court's grant of summary judgment *de novo*, *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015), and we consider the undisputed facts in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(a); *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). Finally, we review a district court's denial of a motion to amend for abuse of discretion, *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000), but where an amendment is denied on the grounds of futility, as it was here, we use the "same standard of legal sufficiency as applies under Rule 12(b)(6)," *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

---

required under Pennsylvania law, that claim would fail in any event. *Reedy v. Evanson*, 615 F.3d 197, 231-32 (3d Cir. 2010) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)).

[4] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

## III.    Discussion

For the reasons we explain below, notwithstanding the disturbing history of this case, we are constrained to affirm the dismissal of Geness's § 1983 claims because they were either time-barred by the date the complaint was filed or were not sufficiently substantiated through discovery. We consider, in turn, Geness's argument concerning the time-barred claims, the District Court's dismissal of his malicious prosecution claim, and the Court's denial of leave to amend with regard to his due process and ADA claims.

### A.    Time-Barred Claims

In what we construe as an argument that the District Court erred in concluding that his § 1983 claims for false arrest, false imprisonment, and reckless investigation were time-barred,[5] Geness urges this Court to "rule that Mrs.

---

[5] Although Geness purports to state a claim for reckless investigation under the Due Process Clause of the Fourteenth Amendment, such a claim, if cognizable, could only arise under the Fourth Amendment. *See Manuel v. City of Joliett, III*, 137 S. Ct. 911, 919 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."); *accord Albright v. Oliver*, 510 U.S. 266, 274 (1994) (plurality opinion). Whatever doubts we may harbor as to the viability of such a claim, however, *see Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (observing that "[a] plaintiff cannot state a due process claim by combining what are essentially claims for

15

Tummons acted in as timely a fashion as possible given all of the circumstances and that . . . the constitutional claims . . . have been preserved." Appellant's Br. 57. The District Court found that, even with tolling until March 2012 when Tummons had sufficient information to file a claim, Geness's false arrest, false imprisonment, and reckless investigation claims were still filed outside the two-year limitations period.

It is the "standard rule" that accrual of a claim "commences when the plaintiff has a complete and present cause of action," *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (citation omitted), which occurs for false arrest and false imprisonment claims when a plaintiff "appear[s] before the examining magistrate and [is] bound over for trial," i.e.,

_____

false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment" (citations omitted)); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (stating that an officer need not "explore and eliminate every theoretically plausible claim of innocence" even if "an investigation might have cast doubt upon the basis for the arrest" (citations omitted)), we have no occasion to resolve them today. First, no such constitutional right was "clearly established" at the relevant time, as required to overcome qualified immunity. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). Second, such a claim, in any event, would be time barred and, for the reasons we discuss below, would not survive summary judgment. *See infra* Section IV.B.2.

"once the victim becomes held pursuant to [legal] process," *Wallace v. Kato*, 549 U.S. 384, 389, 391 (2007) (emphasis omitted).[6] As Geness was held over on the homicide charges in 2007, his § 1983 claims expired sometime in 2009, rendering the filing of his complaint in 2016 far out of time.

Unfortunately for Geness, although we may toll the statute of limitations pursuant to a state law discovery rule or applicable federal tolling principle, *see Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009), we do not have a basis to do so here. Application of a tolling doctrine requires the plaintiff to at least "invoke [the] rule in [the] opening brief." *Id.* at 642. In his opening brief, however, Geness's counsel fails to even mention the "discovery rule," let alone cite to any authority or record support for equitable tolling. Aside from the fact that

---

[6] In its recent opinion in *Manuel*, the Supreme Court left unresolved whether a claim for unlawful pretrial detention, i.e., imprisonment that persists without probable cause beyond the onset of legal process, accrues at the onset of that legal process, like a claim of false arrest, *see Manuel,* 137 S. Ct. at 921 (citing *Wallace*, 549 U.S. at 389-90), or accrues only upon dismissal of the charges, like a claim of malicious prosecution, *id.* In *Manuel*, the Court remanded to the Seventh Circuit to address the issue in the first instance; here, we have no need to address the issue, given both Geness's failure to raise the issue of accrual, *In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (noting that arguments not raised in an appellant's opening brief are forfeited), and our conclusion that Geness, in any event, failed to raise a genuine dispute of material fact as to probable cause, *see infra* Section IV.B.2.

such failure to "cit[e] to the authorities and parts of the record on which the appellant relies" violates Fed. R. App. P. 28(a)(8)(A), it is "well settled that 'a passing reference to an issue will not suffice to bring that issue before this court.'" *Kach*, 589 F.3d at 642 (quoting *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir. 1994)); *see also In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (treating as forfeited arguments not raised in an appellant's opening brief).

In short, Geness has waived any tolling arguments on appeal, and the District Court correctly dismissed Geness's false arrest, false imprisonment, and reckless investigation claims as time-barred.

## B.    Dismissal of the Malicious Prosecution Claim

We next consider the District Court's dismissal of Geness's malicious prosecution claim, which required him to show that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017), *cert. denied*, No. 17-1234, 2018 WL 1173874 (U.S. June 11, 2018) (brackets and citations omitted); *see also Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) ("[T]he Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process . . . ."). Although we conclude the District Court erred in dismissing this claim for failure to

establish "favorable termination," we will nonetheless affirm because Geness failed at summary judgment to raise a genuine dispute of material fact as to the absence of probable cause.[7]

### 1. Favorable Termination

The element of favorable termination is established by showing that the proceeding ended in any manner "that indicates the innocence of the accused," *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009), which can be satisfied when charges are formally abandoned by way of a *nol pros*, *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002). Here, the District Court concluded that the charges did not "favorably terminate" for Geness because the *nol pros* order did not itself indicate his innocence. *Geness v. County of*

---

[7] Having dismissed the malicious prosecution claim at the outset, the District Court did not have occasion to address the presence of probable cause for that claim in particular at summary judgment. As that element is the same, though, for Geness's false arrest and false imprisonment claims, the District Court's conclusion that he failed to establish a triable issue concerning probable cause for those claims would make any remand for that determination on the malicious prosecution claim futile. *See, e.g.*, *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 n.9 (3d Cir. 2010) (declining to remand because the § 1983 claim would have been futile).

*Fayette*, No. 16-876, 2016 WL 6652758, at *6-7 (W.D. Pa. Nov. 9, 2016). That reasoning does not square with our precedent.

Regardless of whether a *nol pros* order on its face "indicate[s] the innocence of the accused," *Donahue*, 280 F.3d at 383, a district court must conduct a "fact-based inquiry," *Kossler*, 564 F.3d at 194, considering, among other things, the "underlying facts" of the case, *id.*, the "particular circumstances" prompting the *nol pros* determination, *id.* at 189, and the substance of the "request for a *nol pros* that . . . result[ed in the] dismissal," *Donahue*, 280 F.3d at 384. Yet the District Court here refused to look beyond the four corners of the order. And it need not have looked far to conclude that the *nol pros* termination here was a favorable termination, for the abandonment of charges for "insufficient evidence" unquestionably provides "an indication that the accused is actually innocent of the crimes charged." *Hilfirty v. Shipman,* 91 F.3d 573, 580 (3d Cir. 1996); *see also Haefner v. Burkey*, 626 A.2d 519, 521 (Pa. 1993) (holding as a matter of Pennsylvania law that *nol pros* "because of insufficient evidence" demonstrates that "the proceedings terminated in favor of the [accused]").

In Geness's case, the DA's Office anticipated it would be "unable to prove the case," App. 174, and the state court agreed that "a reasonable possibility that the decedent just fell" would make it "impossible for the Commonwealth to prove the case beyond a reasonable doubt," App. 177. In addition, the proposed order submitted by the DA's Office expressly acknowledged "substantive evidentiary issues in this matter that likely could and would impair the

20

Commonwealth's ability to meet its burden of proof." App. 205a.

Under *Kossler* and *Donohue*, this *nol pros* disposition did reflect a favorable termination, and the District Court should not have dismissed the malicious prosecution claim for failure to prove that element.[8] Nonetheless, we may affirm on any basis in the record and one such basis is apparent: Geness failed to satisfy his burden to establish a genuine dispute of material fact concerning the absence of probable cause. We turn next to that issue.

## 2. Probable Cause

Where, as here, a probable cause finding was made by a neutral magistrate in connection with a warrant application, a plaintiff must establish "first, that the officer, with at least a reckless disregard for the truth, 'made false statements or omissions that create[d] a falsehood in applying for a warrant,'" and second, "that those assertions or omissions were 'material, or necessary, to the finding of probable cause.'" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468-69 (3d Cir. 2016) (quoting *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)). Omissions are made with reckless disregard only if an officer withholds a fact "in his ken" that any "reasonable person would have known . . . [is] the kind of

---

[8] The fact that the charges were dismissed without prejudice is also not fatal to favorable termination. *See Haefner*, 626 A.2d at 521 n.2 (holding that charges terminated favorably even though they could have been "reinstated").

21

thing the judge would wish to know," *id.* at 470 (quoting *Wilson*, 212 F.3d at 788) (internal quotation marks omitted), and the focus is thus "facts and circumstances within the officer's knowledge" at the time of the arrest, irrespective of later developments, *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Geness's argument, in essence, is that Cox knew and failed to disclose in his Affidavit of Probable Cause (1) the exculpatory evidence in the EMS report and hospital admission records; and (2) Geness's inability, because he was incompetent or highly suggestible, to give a valid confession. We have little doubt that this information, had it been known to Cox when he swore out his Affidavit of Probable Cause, would satisfy the threshold for "[r]eckless [o]missions," *Dempsey*, 834 F.3d at 470-74, and had Geness's counsel "go[ne] beyond the pleadings" and "come forward with 'specific facts showing that there [was] a genuine [dispute concerning such knowledge] for trial,'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)), it would have been error to grant summary judgment.

But there's the rub:  Because Geness elected not to depose Cox,[9] the only evidence in the record concerning

---

[9] While Geness's counsel asserts he did not "choose" to forego Cox's deposition, Appellant's Br. 44 n.15, it is beyond dispute that he sought to depose Cox after the deadline for fact discovery and after Cox's motion for summary judgment had already been filed.  We cannot say it was an abuse of discretion for the District Court to grant a

22

Cox's knowledge of the exculpatory evidence or Geness's competence at that time is Cox's own affidavit in support of summary judgment. In it, Cox swears that he "ha[s] no recollection of ever having seen [the EMS or hospital records] prior to the filing of this lawsuit," App. 164; that to obtain them, he would have required a search warrant, which he also "ha[s] no recollection of ever having obtained," *id.*, and that he observed, before taking Geness's confession, that Geness "indicated his understanding of [Cox's] purpose for being there," that he signed the *Miranda* waiver, and that he "was able to respond" to questions and answer "appropriately," *id.* at 162.

What Geness identifies as contradictory circumstantial "evidence" in the record is, on inspection, nothing more than "speculation or conjecture [that] does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). Even viewing in the light most favorable to Geness, *see* Fed. R. Civ. P. 56(a); *Burton*, 707 F.3d at 425, the fact that the Unionville Hospital records reflect a print-out date of November 16, 2006, the same date as Cox's one-day investigation, it is equally or more plausible—particularly in view of Cox's assertion that he could not access such records without a search warrant—that the records were printed not

protective order, precluding Cox's deposition, in this circumstance. *See United States v. Washington*, 869 F.3d 193, 220 (3d Cir. 2017) ("As we have often said, matters of docket control and discovery are committed to broad discretion of the district court.").

23

for Cox but for hospital risk management personnel, treating physicians, or Fiffik's family members. Nor, outside of hypothetical possibilities, does the record support a linkage between the fact that Cox had a general practice of turning his files over to the DA's Office and the fact that the DA's Office—which could have received the hospital records from any number of sources—eventually had those records in its possession to produce to Tummons.

As Geness elected not to depose any of the witnesses who might have substantiated his hypotheses,[10] however, he is left with disparate facts and possible inferences from which to argue Cox's contemporaneous knowledge of the reports'

---

[10] For example, Geness did not depose any of the Unionville Hospital personnel with whom Cox spoke on the day of the investigation to ascertain whether they communicated to him the substance of the admission report; any hospital records custodian who might have maintained a record of how the admission report came to be printed out on that day and to whom it was provided; Fiffik's daughter concerning her conversation with Cox that day and any documents she may have provided to him at that time; Fiffik's wife concerning any conversations she may have had with Cox before he filed his Affidavit of Probable Cause; or the initial investigating officer concerning what, if anything, he conveyed to Cox about his conversations with Fiffik or McVey on the day of the incident. *See, e.g.*, *Montgomery v. De Simone*, 159 F.3d 120, 122 (3d Cir. 1998) (reversing a grant of summary judgment on malicious prosecution claim because, through discovery, the plaintiff "raised a genuine issue of material fact as to probable cause").

exculpatory contents. At best, however, that amounts to "a mere 'scintilla of evidence' in [Geness's] favor," *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016), and not what is needed to survive summary judgment: "evidence on which the jury could reasonably find for [Geness]," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Geness fares no better with his "facts" purportedly showing that Cox knew at the time that Geness's *Miranda* waiver and confession were not "reasonably trustworthy." *Zimmerman*, 873 F.3d at 418. Geness's current counsel points to Tummons's affidavit, recounting that Geness told her the police put words in his mouth, and notes that he "*expects* [Geness] to be able to testify that he was told by Defendant Cox that he committed this crime, thereby obviating . . . hearsay considerations." Appellant's Br. 45 n. 16 (emphasis added). Starkly absent from the existing record, however, is any testimony or affidavit from Geness, or any other contemporaneous evidence suggesting that his confession was indeed coerced. *Cf. Sutkiewicz v. Monroe Cty. Sheriff*, 110 F.3d 352, 358-60 (6th Cir. 1997) (concluding that recordings of interrogation undermined probable cause because they showed the officer "strongly suggested to [the accused mentally ill man] that he should confess").

And while Geness's counsel insinuates that his impairments were so severe and pronounced that it would have been apparent to any reasonable officer that his confession was involuntary, counsel did not adduce any testimony or evidence to that effect in discovery. For example, Geness's counsel did not seek to depose or submit

25

affidavits from personnel at Highlands Hospital where Cox interviewed Geness, the physicians who conducted Geness's psychiatric examinations, or any experts as to how Geness presented at the time and whether his incompetence would have been obvious.[11]  *Cf. Sanchez v. Hartley*, 810 F.3d 750, 756 (10th Cir. 2016) (holding that the plaintiff's "pronounced cognitive and developmental disabilities," coupled with allegations that the "detectives and investigator noticed [the plaintiff's] unusual behavior," supported plausible inference that "the defendants either knew the confession was untrue or acted in reckless disregard of the truth").  In short, aside from Geness's mental condition—which, "by itself and apart from its relation to official coercion," does not render his confession involuntary, *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)—Geness has not identified any admissible evidence in Cox's "ken" contradicting the affidavit.  *Dempsey*, 834 F.3d at 469-70.

According to that affidavit, the "facts and circumstances within . . . [Cox's] knowledge" at the time of the arrest, *DeFillippo*, 443 U.S. at 37, were (1) that Fiffik's daughter believed her father had been pushed off the wall by Geness; (2) that McVey had heard Geness scream at Fiffik moments before Fiffik was discovered on the ground, had seen Geness rush to his room and assume a fetal position, and

---

[11] To the contrary, counsel argues that even Tummons did not appreciate "the extent of [Geness's] mental impairment" until she received the psychiatric reports, Appellant's Br. 54-55—two years after she met with Geness and took on his representation.

had been told by Fiffik later that day Fiffik had been pushed; and (3) that Geness—after agreeing to speak, waiving his *Miranda* rights, and answering basic questions accurately and appropriately—provided a confession consistent with McVey's account. Probable cause requires only sufficient probability, not certainty that a crime has been committed, *see Zimmerman*, 873 F.3d at 418-19. As the foregoing discussion makes clear, the facts then known to Cox were sufficient for a "reasonable person" to reach that conclusion. *Dempsey*, 834 F.3d at 469-70.[12]

---

[12] Under our case law to date, a malicious prosecution claim fails so long as "the proceeding was *initiated* . . . with[] probable cause." *Zimmerman*, 873 F.3d at 418 (emphasis added). The Supreme Court has recently stated, though, that, "those objecting to a pretrial deprivation of liberty may invoke the Fourth Amendment when . . . that deprivation occurs [even] after legal process commences," *Manuel*, 137 S. Ct. at 918, and some of our Sister Circuits have implicitly authorized a malicious prosecution claim based upon a theory of "continuing prosecution," i.e., that the prosecution continued and charges were not dismissed after the revelation of sufficient exculpatory information to undermine a probable cause finding, *see Haupt v. Dillard*, 17 F.3d 285, 290 n.5 (9th Cir. 1994), *as amended* (Apr. 15, 1994) ("Probable cause to continue a prosecution may disappear with the discovery of new exculpatory evidence after the preliminary hearing . . . [and] state actors who . . . suppress [this evidence] may be liable for malicious prosecution . . . ."); *accord Jones v. City of Chi.*, 856 F.2d 985, 994 (7th Cir. 1988) (noting that a malicious prosecution claim could be stated "[i]f police officers have been instrumental in the plaintiff's continued

### C.    The ADA and Due Process Claim

Finally, we turn to Geness's claims that his prolonged detention, without a hearing, pending duplicative and futile psychiatric examinations violated due process and constituted discrimination "by reason of [mental] disability" under the ADA.  42 U.S.C. § 12132.  These claims go to the heart of the systemic problems that plagued this case, but Geness did not have the opportunity to pursue them because he initially named the wrong defendants and the District Court denied him leave to add the right one, the Commonwealth.  Its reasoning was that, although requests to amend generally should be "freely given" in the absence of (1) undue delay, bad faith or dilatory motives, (2) futility, or (3) prejudice to the other party, *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Lake*, 232 F.3d at 373; *see also* Fed. R. Civ. P. 15, two of those grounds applied here: futility, because the claims would be barred under the *Rooker-Feldman* doctrine, and delay, because Geness provided no explanation, other than "recently discovered case law" in the form of the thirteen-year-old Supreme Court case *Tennessee v. Lane*, 541 U.S. 509 (2004), for waiting four-months before seeking to add the Commonwealth.  *Geness*, 2017 WL 1058826, at *2-3.

For the reasons we explain below, neither of these grounds justified a departure from the general rule in favor of permissive amendment.

---

confinement or prosecution").  We have no occasion to consider that theory today, as it was not raised by Geness and he states his claim only against Cox, not any other actors responsible for Geness's continued confinement.

28

## 1. Geness's ADA and Due Process Claims Are Not Futile.

### a. Geness's Claims Are Not Barred by *Rooker-Feldman*.

The *Rooker-Feldman* doctrine "bars federal district courts from exercising appellate jurisdiction over state court actions." *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 342 F.3d 242, 256 (3d Cir. 2003) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923)). This "narrow doctrine . . . applies only in 'limited circumstances,'" *Lance v. Dennis*, 546 U.S. 459, 464-66 (2006), and is restricted to cases where "four requirements are met: (1) the federal plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state-court judgment, (3) that judgment issued before the federal suit was filed, and (4) the plaintiff invites the district court to review and reject the state-court judgment." *In re Phila. Entm't & Dev. Partners*, 879 F.3d 492, 500 (3d Cir. 2018) (citing *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010)).

Contrary to the District Court's ruling that Geness stated "a direct challenge to a state court's orders and judgments," App. 30, neither the first nor the fourth requirements were met. Geness is not a "state-court loser[]," *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 293 (2005), in the sense that his ADA and due process claims were presented to or ruled upon by the state court; they were not. Nor is Geness a "federal plaintiff who was injured by a state-court judgment . . . invariably seeking review and rejection of that judgment." *Great Western*, 615

29

F.3d at 168. Instead, a subsequent federal claim constitutes "[p]rohibited appellate review" only when it "consists of a review . . . to determine whether [the lower tribunal] reached its result in accordance with law," *id.* at 169, or when the federal plaintiff seeks "to have the state-court decisions undone or declared null and void," *id.* at 173.

Neither pertains here. Geness asserts that the orders requiring him to be held for future, duplicative examinations, despite the hopelessness of his gaining competence, and the prolonged detention that resulted, amounted to disability discrimination. His federal suit thus presents an "'independent claim,' even if that claim denies a legal conclusion reached by the state court," *id*. at 169 (quoting *Exxon Mobil Corp.*, 544 U.S. at 293), and seeks a remedy for the "legal injury caused by the adverse party"—the Commonwealth of Pennsylvania—not any "legal injury caused by a state court judgment because of a legal error committed by the state court," *id.*

As a result, this case falls comfortably outside the boundaries we have set for the *Rooker-Feldman* doctrine. In *Great Western*, where the plaintiff asserted the defense attorney had conspired with the Common Pleas judges who ruled on his arbitration-related claim, we explained that *Rooker-Feldman* does not present a jurisdictional bar to federal review when the plaintiff asserts not "merely" that the "state-court decisions were incorrect," *id.* at 172, but that "people involved in the decision violated some independent right," *id.* Similarly, in *Desi's Pizza, Inc. v. City of Wilkes-Barre*, a case concerning repeated state court determinations that the plaintiff's pizza shop was a nuisance, we held *Rooker-Feldman* inapplicable where the shop owner alleged

30

his shop was targeted for enforcement "with the intent to drive certain ethnic groups out of the city," because such a claim arose independently of the state court finding that the shop was, in fact, a nuisance. 321 F.3d 411, 422-26 (3d Cir. 2003); *see also id.* at 425 ("It is well established . . . that selective prosecution may constitute illegal discrimination even if the prosecution is otherwise warranted." (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985))).

Like those plaintiffs, Geness alleges "federal [due process] and statutory discrimination claims," *id.* at 423, namely, that the Office of the Fayette County District Attorney and the Court of Common Pleas of Fayette County acted in concert to deprive him of "an independent constitutional" and statutory right—the right to a forum free of disability discrimination—that arises irrespective of whether he was, in fact, competent to stand trial, *Great Western*, 615 F.3d at 161. *Rooker-Feldman* is therefore inapplicable, and the District Court erred in denying leave to amend on that ground of futility.

### b. Geness's Claim Is Not Otherwise Futile.

As we may affirm on any ground supported by the record, we have considered whether Geness's proposed claim would be futile for any other reason and conclude it would not. On the contrary, "taking all pleaded allegations as true and viewing them in a light most favorable to the plaintiff" as we must when evaluating futility, *Great Western*, 615 F.3d at 175 (citing *Winer Family Tr. v. Queen*, 503 F.3d 319, 330-31 (3d Cir. 2007)), Geness has stated cognizable ADA and due process claims.

31

To state a claim under Title II of the ADA, Geness must establish: "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Haberle v. Troxell*, 885 F.3d 170, 178-79 (3d Cir. 2018) (brackets omitted); *see also* 42 U.S.C. § 12132.

As for the first two, he sufficiently pleaded that he is a qualified individual with a disability. *See* App. 78; *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-11 (1998) (holding that a state prisoner is a "qualified individual" under the ADA); 42 U.S.C. § 12102(1)(A) (defining "disability" to include "a . . . mental impairment that substantially limits one or more major life activities").

He also sufficiently pleaded the last two, i.e., that he was "denied . . . benefits [and] services" and "subjected to discrimination . . . by reason of his disability." *Haberle*, 885 F.3d at 178. Regulations promulgated under the ADA require that the Commonwealth "*shall* ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals," 28 C.F.R. § 35.152(b)(2) (emphasis added), and "[s]hall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available," *id.* § 35.152(b)(2)(i). Pennsylvania's Mental Health Procedures Act also requires that "[w]henever a person who is detained on criminal charges or is incarcerated is made subject to inpatient examination or treatment, he *shall be transferred*, for this purpose, to a mental health facility," 50 Pa. Cons. Stat. Ann. § 7401(b) (emphasis added), and

32

although the Act provides that a person accused of murder "may be subject to court-ordered involuntary treatment," it limits that to "a period not to exceed one year," *id.* § 7304(g)(2). Involuntary competency restoration treatment can only take place if it is "reasonably certain that the involuntary treatment will provide the defendant with the capacity to stand trial." *Id.* § 7402(b). These procedural protections are designed to avoid undue delays and safeguard the fair and efficient functioning of the criminal justice system, and the denial of those protections, leading to the "unjustified institutional[ization] . . . of persons with disabilities," is "a form of discrimination." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

Here, despite the Commonwealth's statutory commands and the protections they were intended to provide, Geness was incarcerated for seven months before he was ordered to seek treatment, was forced to wait three months more for that order to be carried out, and—notwithstanding that the competency evaluation declared him "unable to recognize the role of personnel in the court system," "unable to recognize the different methods of trial," "unable to recognize various outcomes from his pending charges," with a "poor" prognosis for improvement, App. 197-98—Geness was returned to prison for three years. He was then ordered to undergo another evaluation, forced to wait another *year* to receive it, and involuntarily committed for several more years—not only without "reasonabl[e] certain[ty]" he would attain capacity, 50 Pa. Cons. Stat. Ann. § 7402(b), but in the face of a second evaluation that had declared him "not likely to respond to any additional treatment interventions." App. 203.

33

As alleged, these multiple, protracted, and inexcusable delays in the handling of Geness's examinations, transfers, and motions—resulting in nearly a decade of imprisonment and civil commitment before a hearing was finally held on his habeas petition—are more than sufficient to state a claim under the ADA.[13]  *See Haberle*, 885 F.3d at 179 (finding discrimination on the basis of disability where the "disability 'played a role in the . . . decisionmaking process and . . . had a determinative effect on the outcome of that process'"); *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013) ("To satisfy . . . causation [under the ADA], Plaintiffs must prove

---

[13] To the extent Geness seeks monetary damages on his ADA claim, *see* App. 79, he must "adequately ple[a]d that [the Commonwealth] acted with deliberate indifference to the risk of an ADA violation." *Haberle*, 885 F.3d at 181. "[C]laims for compensatory damages under . . . the ADA also require a finding of intentional discrimination," which requires proof, at minimum, of deliberate indifference, *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261-63 (3d Cir. 2013), which may be pleaded by showing that the defendant failed to "adequately respond to a pattern of past occurrences of injuries like the plaintiff['s]," *Beers-Capitol v. Whetzel*, 256 F.3d 120, 136 (3d Cir. 2001). Geness's complaint does not do this, thus, like we did recently in *Haberle*, we will grant him "the narrow opportunity to amend h[is] complaint with respect to [his] ADA claim, particularly [the] allegations of a history of civil rights violations by [the Commonwealth], because deliberate indifference was not discussed in the District Court as to that claim," 885 F.3d at 182 n.12.

that they were treated differently based on . . . their disability."); *see also Cooper v. Kliebert*, No. 15-751-SDD-RLB, 2016 WL 3892445, at *6 (M.D. La. July 18, 2016) (denying motion to dismiss ADA claims brought by mentally handicapped pretrial detainees stemming from denial of "prompt transfer of [plaintiffs] . . . from [local] jails" to appropriate mental health facilities).

These same circumstances are also sufficient to sustain Geness's claim that he was "depr[ived] . . . of normal benefits of criminal procedure and due process of law," App. 78, both as to his protracted incarceration without prompt transfer to a mental health facility, and his protracted institutionalization without a realistic prospect of trial. As for his incarceration, Pennsylvania requires that criminal defendants suspected of mental illness receive mental health services, 50 Pa. Cons. Stat. Ann. § 7401(b), and it is well-established that the extended imprisonment of pretrial detainees when they have been ordered to receive such services violates the Constitution.[14] *See Foucha v. Louisiana*, 504 U.S. 71, 77

---

[14] The Commonwealth acknowledged as much in a recently-settled class action brought on behalf of mentally ill inmates who claimed that the practice of continuing detention "for more than thirty . . . days after the determination that the [plaintiff] is unlikely to become competent," violates the Constitution and the ADA. *See* Complaint at ¶ 193, *J.H. v. Dallas*, No. 1:15-cv-02057-SHR (M.D. Pa. Oct. 22, 2015). In the settlement agreement, the Commonwealth stipulated that, generally, excessive wait times violate the Constitution and, specifically, its "average wait times of at least sixty . . . days . . . fail to comply with Fourteenth Amendment due process

(1992) ("[It is] unconstitutional for a State to continue to confine a harmless, mentally ill person."); *see also Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1039 (9th Cir. 2016) ("It is well recognized that detention in a jail is no substitute for mentally ill detainees who need therapeutic evaluation and treatment."); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003) ("Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights . . . .").[15]

---

guarantees." Settlement Agreement at 3, ECF No. 35, *J.H. v. Dallas*, No. 1:15-cv-02057-SHR (M.D. Pa. Jan. 27, 2016). Those violations, moreover, appear to be widespread. According to the County Commissioners Association of Pennsylvania, "[c]ounties have reached a level of frustration over the inability to address mental illness in jails due to resource limits at the state level," Cty. Comm'rs Ass'n of Pa., *Comprehensive Behavioral Health Task Force: Report of Findings and Recommendations* at 5, (Aug. 7, 2016), https://tinyurl.com/y88z8mzp, and "[t]he shortage of psychiatric, or forensic, beds in state hospitals for county inmates who have mental illness and developmental disabilities has become a crisis that fails to effectively or compassionately address human need," Cty. Comm'rs Ass'n of Pa., *Increasing Forensic Bed Access for County Inmates with Mental Illness* (2018), https://tinyurl.com/y7d7qebl.

[15] *See also Hunter v. Beshear*, No. 2:16-cv-798-MHT, 2018 WL 564856 (M.D. Ala. Jan. 25, 2018); *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998 (D. Utah 2016); *Advocacy Ctr. for the Elderly & Disabled v. La. Dep't of Health &*

As for his institutionalization, the Supreme Court announced more than forty years ago in *Jackson v. Indiana*, 406 U.S. 715 (1972), that "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial does not square with the Fourteenth Amendment's guarantee of due process," *id.* at 731, and the Constitution forbids detention of the accused "committed solely on account of . . . incapacity" any longer than "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future," *id.* at 738. Once it has been determined that there is no substantial probability that the defendant will attain the capacity to stand trial, a state "must" either "institute . . . customary civil commitment proceeding[s]" or "release the defendant." *Id.*; *see also Foucha*, 504 U.S. at 77 ("Even if the initial commitment was permissible, 'it [can]not constitutionally continue after that basis no longer exist[s].'"); *United States v. Foy*, 803 F.3d 128, 142 (3d Cir. 2014) (Krause, J., concurring) (observing that "the circumstances of Foy's continued civil commitment in federal custody raise significant statutory and due process concerns"). Even if there is a likelihood of regaining capacity, "continued commitment must be justified by progress towards that goal," and while the Court has declined to impose "arbitrary time limits," the three-year commitment period in *Jackson* "sufficiently establishe[d]" that the detainee would never be "able to participate fully in a trial." 406 U.S. at 738-39.

---

*Hosps.*, 731 F. Supp. 2d 603 (E.D. La. 2010); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934 (E.D. Ark. 2002).

In view of this authority, the constitutional claims Geness seeks to bring against the Commonwealth as to both the length of his pretrial imprisonment and the length of his civil commitment would not be futile. After his first psychological evaluation indicated that he "remain[s] incompetent to stand trial," App. 198, Geness was incarcerated for an additional three years before civil commitment proceedings and a second examination were even *requested*. And once institutionalized, Geness was left to languish for another four years before he was granted a hearing on his habeas petition and the charges against him were dismissed. There is no question this exceeded the "reasonable period of time necessary" under *Jackson* to ascertain whether there was a substantial probability Geness would attain competency in the foreseeable future.

### 2.    Geness Did Not Unduly Delay in Seeking Amendment.

The ground of "undue delay" also did not justify the District Court's denial of leave to amend. As we have cautioned, "delay alone is an insufficient ground to deny leave to amend," and only delays that are either "undue" or "prejudicial" warrant denial of leave to amend. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

Geness's delay in seeking to substitute the Commonwealth as a party was neither. His delay was not "undue" because he raised it less than a year from the filing of his complaint, *see Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir.1993) (finding a three year lapse between filing of complaint and proposed amendment an "unreasonable"

38

delay), and doing so at the summary judgment stage "is not unusual," *Adams v. Gould Inc.*, 739 F.2d 858, 869 (3d Cir. 1984) (citing 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1488, at 436 (1971)); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990) ("Amendment may be permitted at any point during the course of litigation."). It also would not have prejudiced Cox because, as the District Court noted, Geness's "proposed factual allegations in his amended complaint . . . against the Commonwealth . . . are identical to those in his . . . complaint against Fayette County," *Geness*, 2017 WL 1058826, at *3. Thus, amendment would not have required of the detective any "additional discovery, cost, and preparation to defend against new facts or new theories." *Cureton*, 252 F.3d at 273.[16]

In sum, neither futility nor delay justified the denial of leave for Geness to amend his complaint to reinstate his ADA and due process claims against the Commonwealth.

---

[16] The prejudice inquiry considers the effect of amendment on the existing defendants in the case, not the new defendant proposed to be added by way of amendment. *Lorenz,* 1 F.3d at 1414 ("[P]rejudice *to the non-moving party* is the touchstone for the denial of an amendment.") (emphasis added); *see also Formosa Plastics Corp., U.S.A. v. ACE Am. Ins. Co.*, 259 F.R.D. 95, 99 (D.N.J. 2009) (finding no prejudice when "Plaintiff is only seeking to add one additional party and, as such, the current Defendants will likely not incur significant additional resources . . . .").

## IV.    Conclusion

Absurd as it may seem that Geness was detained for nine years for a crime that may not have occurred and now cannot pursue relief under § 1983, multipoint failures in the criminal justice system have brought us to this juncture. Those failures point up the essential role of each player in that system—whether law enforcement officer, prison official, mental health professional, defense counsel, prosecutor, or judge—and the devastating consequences that can follow when one or more of them fails to diligently safeguard the civil rights with which they are entrusted.    With the complexities at the intersection of the criminal justice and mental health systems, those risks are only compounded and require vigilance at a systemic level.  As for the case before us, we will reverse the District Court's denial of leave to amend, remanding for Geness to reinstate his claim against the Commonwealth, and we will affirm the District Court in all other respects.