PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1012
_____

DWAYNE HARVARD

Appellant

v.

CHRISTOPHER J. CESNALIS; DANIEL L.
BEATTY

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No.: 2-17-cv-00505)
District Judge: Honorable Joy Flowers Conti

Argued July 2, 2020

(Opinion Filed: September 1, 2020)

Before:  GREENAWAY, JR., SHWARTZ, and RENDELL,
*Circuit Judges*.

Massimo Terzigni (Argued)
Joel S. Sansone
Law Offices of Joel Sansone
603 Stanwix Street
Two Gateway Center, Suite 1290
Pittsburgh, PA 15222

Counsel for Appellant

Michael J. Scarinci (Argued)
Daniel B. Mullen
Office of the Attorney General of Pennsylvania
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

Counsel for Appellees

O P I N I O N

RENDELL, *Circuit Judge*:

This case involves a series of troubling events resulting in Appellant Dwayne Harvard being arrested and charged with six state crimes ranging from reckless endangerment to driving under the influence. Harvard brought an action under 42 U.S.C. § 1983 against the involved police officers in the United States District Court for the Western District of Pennsylvania claiming false arrest, false imprisonment, malicious prosecution, violation of his right to Equal Protection, reckless investigation, and civil conspiracy. The District Court granted summary judgment for the defendant police officers,

concluding *inter alia* that no reasonable juror could conclude that the officers lacked probable cause to arrest Harvard for the crimes charged. We disagree. We will vacate the District Court's grant of summary judgment for defendant state trooper Christopher Cesnalis as to the false arrest, false imprisonment, malicious prosecution and Equal Protection claims. We will affirm the District Court's grant of summary judgment in favor of Cesnalis as to the remaining claims. We will also affirm the District Court's grant of summary judgment in favor of defendant state trooper Daniel Beatty on all claims.

## I. BACKGROUND

### A. Factual Background

This incident began with an offer of a ride home. After leaving a sports bar in New Kensington, Pennsylvania where he had spent two hours watching sports, eating food, and drinking two beers, Harvard was flagged down by a stranger, Anna Mazzetti, who was standing outside a convenience store. Mazzetti asked Harvard for a ride home. She told Harvard that she was afraid of her boyfriend, who had been drinking and was physically abusive. Harvard agreed to give Mazzetti a ride home.

Upon arrival, Mazzetti's boyfriend, Steven Sutton, approached Harvard's vehicle and began yelling at Mazzetti, making threats, and trying to get Mazzetti out of the vehicle. Sutton, a White male, used racial slurs against Harvard, a Black male. Sutton attempted to enter Harvard's vehicle, but the doors were locked. Sutton then proceeded to pick up a cinder block and cocked his arm back as if to throw the cinder block through the vehicle's windshield. Sutton threatened to kill both Harvard and Mazzetti multiple times. Sutton brandished a large kitchen knife and told Mazzetti that he would "chop her

3

up." App. 57. He also threatened to shoot Harvard. Sutton then told Harvard to "stay right there" because he "got something for [him]." App. 283. Sutton then returned to the house.

Believing Sutton to be a threat, Harvard called 911 to inform the police of the situation and ask what he should do. Harvard, afraid for both his and Mazzetti's safety, proceeded to exit the driveway while Mazzetti was still in the vehicle with Harvard. Sutton re-emerged from the house and jumped onto the hood of Harvard's moving vehicle, a Ford Explorer SUV. Harvard slowed his vehicle multiple times to allow Sutton to remove himself from the vehicle's hood. Rather than remove himself, Sutton began pounding on the hood of the vehicle and continued to threaten to kill Harvard. Sutton also continued to use racial slurs against Harvard and told Harvard that he would kill Harvard as soon as he stopped driving. Harvard noticed a bulge in Sutton's waistband, which Harvard believed to be a firearm. Sutton was still carrying the large kitchen knife. Harvard, still on the phone with 911, informed the operator that Sutton was on the hood of the vehicle and was threatening to kill him and Mazzetti.

With Sutton still on the hood, and while still on the phone with 911, Harvard drove onto the highway, where he drove around or above the speed limit. Before Harvard entered the highway, Sutton discarded his knife. Once on the highway, Sutton ripped the windshield wipers off Harvard's vehicle. Harvard remained on the phone with the 911 operator and requested assistance from law enforcement officers. The 911 operator instructed Harvard to take a specific exit from the highway, where law enforcement officers would be waiting. While exiting the highway, Harvard observed Sutton discard what he believed to be the firearm hidden in his waistband.

4

Following the 911 operator's instructions, Harvard exited the highway and reached the police roadblock, where the officers present had their firearms drawn. At that point, Harvard had traveled approximately ten miles with Sutton on the hood of his vehicle. The officers ordered Sutton to get on the ground and ordered Harvard and Mazzetti to exit the vehicle with their hands in the air. Sutton was handcuffed and placed into the back of a patrol car.

Defendant state trooper Cesnalis arrived on the scene shortly thereafter. Prior to arriving, Cesnalis was informed that Harvard had been driving on the highway with a man on the hood of his vehicle. Cesnalis was also informed that Harvard had contacted 911 and reported that he feared for his safety. Cesnalis first interviewed Harvard. Harvard informed Cesnalis of Sutton's violent and threatening behavior and told Cesnalis that he was afraid for his life. Harvard also said that Sutton had been holding a large knife and had continued to reach towards his waistband, where Harvard believed Sutton carried a firearm. Cesnalis did not respond to Harvard's explanation and made no effort to locate the knife or the firearm.

Instead, Cesnalis asked whether Harvard had been drinking. Harvard responded that he had consumed two beers approximately four hours earlier. Cesnalis noted that he smelled a "moderate" odor of alcohol and that Harvard was speaking rapidly and appeared sweaty. App. 384. Based on these observations, Cesnalis asked Harvard to take a Breathalyzer test, to which Harvard agreed. Harvard initially had difficulty completing the test. During his attempts, Cesnalis threatened to handcuff Harvard and said: "You understand me boy, I want you to blow into the Breathalyzer." App. 46 (emphasis omitted). After six tries, Harvard completed the Breathalyzer test, which indicated that his blood

5

alcohol content (BAC) was 0.064%, below the legal limit of 0.08%. Cesnalis nonetheless inferred that Harvard was under the influence of stimulants or narcotics because he was sweaty, speaking rapidly, and not directly answering questions. Harvard was handcuffed and taken to the police station for "safety reasons." App. 46.

Cesnalis interviewed Sutton next. At the time of the interview, Cesnalis was aware that Sutton had a criminal record and had prior encounters with the police. Sutton told Cesnalis that Harvard had hit him with a Ford Explorer SUV and that Sutton had then landed on the hood of the SUV. Cesnalis did not think Sutton's explanation for how he ended up on top of the SUV after being hit made sense. Cesnalis also did not observe any injuries to Sutton which would indicate that he had just been hit by an SUV. Nonetheless, Cesnalis did not ask any follow up questions to probe Sutton's explanation. Despite his incredible statement and Harvard's account of the incident, Sutton was not arrested or charged with any crimes.

Cesnalis then interviewed Mazzetti. Prior to interviewing Mazzetti, Cesnalis testified that he had already decided to arrest Harvard. Mazzetti corroborated Harvard's statements regarding Sutton's threatening and violent behavior. Specifically, Mazzetti told Cesnalis that Sutton was "crazy" and had threatened to throw a cinder block through the windshield. App. 423. She also said that she was afraid to get out of the vehicle and that Harvard slowed his vehicle to give Sutton the opportunity to remove himself from the hood, but Sutton refused to do so. She also "tried to tell [the officers] about the butcher's knife" and stated that Sutton was drunk and currently on probation. App. 258.

Cesnalis arrested Harvard and transported him to the police station for further investigation. Harvard again tried to

6

explain that Sutton had a weapon and had been threatening Harvard and Mazzetti, but Cesnalis ignored these statements. Cesnalis then informed defendant state trooper Daniel Beatty, a Drug Recognition Expert, that Harvard had driven with a man on the hood of his vehicle. Cesnalis also told Beatty that Harvard had "admitted to drinking several beers" and that Harvard was "very talkative and sweaty." App. 540. Cesnalis further informed Beatty that Sutton had witnessed Harvard smoking crack cocaine while driving. No evidence supports this accusation.

Based on the information Cesnalis provided, Beatty ran a series of tests to determine whether Harvard was under the influence of drugs or alcohol. Harvard's BAC at the time of the examination was 0.051%. Beatty completed a Drug Recognition Evaluation (DRE), in which he reported that Harvard was cooperative, his coordination seemed poor, his face was sweaty, he was very talkative, his eyes were bloodshot and watery, his pulse was substantially higher than normal, and there was a lack of smooth pursuit during the horizontal gaze nystagmus. Beatty detected no distinct odors. Beatty's DRE concluded that Harvard was "under the influence of CNS Depressants and CNS Stimulants," which "impaired his ability to safely drive, operate or be in actual physical control of a motor vehicle." App. 545-46. Beatty requested that Harvard consent to a blood test, to which Harvard agreed. The blood test later returned negative results for all tested drugs and indicated that Harvard's BAC was 0.016%.

Cesnalis filed an affidavit of probable cause with the magistrate judge, charging Harvard with: (1) recklessly endangering another person (18 Pa. Cons. Stat. § 2705); (2) reckless driving (75 Pa. Cons. Stat. § 3736(a)); (3) simple assault (18 Pa. Cons. Stat. § 2701(a)(3)); (4) aggravated assault

(18 Pa. Cons. Stat. § 2702(a)(1)); (5) disorderly conduct (18 Pa. Cons. Stat. § 5503(a)(4)); and (6) driving under the influence of a controlled substance (75 Pa. Cons. Stat. § 3802(d)(2)).[1]  In the affidavit, Cesnalis referred to Sutton as "the victim" and entirely credited Sutton's version of events. For example, Cesnalis indicated that Harvard hit Sutton with his vehicle; Sutton landed on the hood of the vehicle; and Harvard continued driving and refused to stop, leaving Sutton "hanging onto the hood of the vehicle for his life" until Harvard

---

[1] A person is guilty of recklessly endangering another person if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. Cons. Stat. § 2705.

A person is guilty of reckless driving if he "drives any vehicle in willful or wanton disregard for the safety of persons or property." 75 Pa. Cons. Stat. § 3736(a).

A person is guilty of simple assault if he "attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa. Cons. Stat. § 2701(a)(3).

A person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another."  18 Pa. Cons. Stat. § 2702(a)(1).

A person is guilty of disorderly conduct if he "creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."  18 Pa. Cons. Stat. § 5503(a)(4).

A person is guilty of driving under the influence of alcohol or a controlled substance if he was "under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle."  75 Pa. Cons. Stat. § 3802(d)(2).

8

was eventually stopped by local police officers. App. 133. Cesnalis indicated that he believed Sutton's version of events because of Harvard's "reputation for criminal activity," App. 132, despite there being no evidence that Harvard has a criminal background. Cesnalis also omitted several exculpatory facts from the affidavit. For example, Cesnalis did not include that Harvard initiated the 911 call because he feared for his safety or that he followed the 911 operator's instructions, which guided him to the police blockade. Further, he did not include statements from either Harvard or Mazzetti indicating that Sutton was violent and aggressive, that Sutton had a weapon, that Sutton threatened to kill them, or that Harvard slowed down his vehicle to allow Sutton to get off the hood, which Sutton refused to do. Cesnalis also failed to note that Harvard completed a Breathalyzer test and his BAC was below the legal limit.

After a preliminary hearing, the magistrate judge dismissed the DUI charge. A bench trial was held on the remaining charges and Harvard was found not guilty on all charges.

### B.   Procedural History

Harvard brought a § 1983 claim against Cesnalis and Beatty alleging: false arrest, false imprisonment, malicious prosecution, violation of the Equal Protection clause, reckless investigation, and civil conspiracy to deprive him of his rights under the Fourth Amendment.[2] The defendants filed a motion for summary judgment, arguing that Harvard failed to assert any viable claims under § 1983.

---

[2] Harvard also asserted various state law claims, but later withdrew them at summary judgment.

The District Court granted summary judgment for the defendants on all claims. For the false arrest, false imprisonment, and malicious prosecution claims, the District Court concluded that no reasonable juror could find probable cause lacking. For the Equal Protection claim, the District Court ruled that Harvard failed to identify a similarly situated person who was treated differently because of race. For the reckless investigation claim, the District Court determined that our Circuit has never recognized such a claim under § 1983, and even if such a claim were recognized in this case, the officers would be entitled to qualified immunity. For the civil conspiracy claim, the District Court granted summary judgment for the defendants because there was no underlying violation of Harvard's constitutional rights, based on its assessment of the other claims. This appeal followed.

## II    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review of a district court's grant of summary judgment. *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010). We may affirm the District Court's grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing a summary judgment ruling, we must view all facts "in the light most favorable to the non-moving party, who is 'entitled to every reasonable inference that can be drawn from the record.'" *Reedy*, 615 F.3d at 210 (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000)). We may only affirm a district court's grant of summary judgment if "the evidence, viewed most favorably to [the nonmoving party], reasonably would not

10

support a contrary factual finding." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016) (alteration in original) (citation omitted).

## III. DISCUSSION

Harvard challenges the District Court's Order granting summary judgment for the defendants on all claims. Harvard argues that his claims should have proceeded to trial because the defendants led a racially biased investigation against him; arrested, imprisoned, and charged him without probable cause; and conspired to deprive him of his constitutional rights. We will address each claim in turn.

### A. False Arrest

To bring a claim for false arrest, a plaintiff must establish "(1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). The parties agree that Cesnalis arrested Harvard at the scene but disagree on whether Cesnalis had probable cause to arrest him. False arrest and false imprisonment claims will "necessarily fail if probable cause existed for any one of the crimes charged against the arrestee." *Dempsey*, 834 F.3d at 477. Thus, summary judgment for false arrest and false imprisonment is proper only if no reasonable juror could find a lack of probable cause for any of the charged crimes.[3] We must therefore assess the requirements for all of the crimes charged to determine

---

[3] For malicious prosecution, probable cause on one charge "does not foreclose a malicious prosecution cause of action" as to a separate charge which lacks probable cause. *Johnson v. Knorr*, 477 F.3d 75, 83 (3d Cir. 2007).

whether any reasonable juror could find that Cesnalis lacked probable cause to arrest Harvard. Harvard was arrested for six separate crimes and, as we outlined in footnote 1, *supra*, each of the six crimes has a different requisite mental state. We will therefore assess whether any reasonable juror could find that Harvard lacked the requisite mental state for each of the crimes charged.

"Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (citation omitted). An officer has probable cause to arrest a person "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). In determining probable cause, arresting officers must consider plainly exculpatory evidence in addition to inculpatory evidence. *Wilson*, 212 F.3d at 790. This is true "even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id*. (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)).

Because we are evaluating probable cause at the summary judgment stage, we must assess probable cause based upon the "totality-of-the-circumstances" available to the arresting officer and view those circumstances in the light most favorable to Harvard. *Dempsey*, 834 F.3d at 467-68 (citation omitted). As part of this assessment, we must determine whether the plainly exculpatory evidence available to the arresting officer "outweighs the probable cause otherwise established" through inculpatory evidence. *Id*. at 478, 490 (alteration, internal quotation marks, and citation omitted). This totality-of-the-circumstances inquiry is "necessarily fact-

intensive" and thus "it will usually be appropriate for a jury to determine whether probable cause existed." *Id.* at 468; *see also Merkle*, 211 F.3d at 788 ("Generally, the question of probable cause in a section 1983 damage suit is one for the jury." (internal quotation marks and citation omitted)). We undertake our analysis on a crime-by-crime basis.

First, a person is guilty of recklessly endangering another person if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. Cons. Stat. § 2705. Driving with a man on the hood of a vehicle undoubtedly places the person on the hood in danger of serious bodily injury. Thus, the *actus reus* requirement for reckless endangerment is satisfied, as no reasonable juror could find otherwise. But we are not so sure for the *mens rea* requirement, namely, whether Harvard acted recklessly in light of the totality of the circumstances.

Under Pennsylvania law, a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk." 18 Pa. Cons. Stat. § 302(b)(3). Viewing the facts in the light most favorable to Harvard, a reasonable juror could find that Harvard acted as a good Samaritan by agreeing to give Mazzetti—standing alone and afraid of her boyfriend, Sutton—a ride home. Once Sutton emerged from the house, aggressive, violent, and threatening, and then jumped onto the hood of his vehicle, a juror could find that Harvard's decision to drive with Sutton on the hood of his vehicle was a justifiable risk to protect himself and Mazzetti from Sutton's abhorrent behavior. This is particularly true because Harvard slowed his vehicle multiple times to allow Sutton to remove himself from the hood, but Sutton refused to do so and instead pounded on the hood of the vehicle and threatened to kill Harvard and Mazzetti as soon as Harvard stopped driving. Moreover,

13

Harvard contacted 911 for help and followed the 911 operator's instructions throughout the entire incident. We therefore conclude that, viewing all of the facts in the light most favorable to Harvard, a reasonable juror could find that Harvard was not consciously disregarding an unjustifiable risk and could find a lack of probable cause for the crime of recklessly endangering another person.

Second, a person is guilty of reckless driving if he "drives any vehicle in willful or wanton disregard for the safety of persons or property." 75 Pa. Cons. Stat. § 3736(a). "Willful or wanton" within the context of reckless driving "means the driver grossly deviates from ordinary prudence and creates a substantial risk of injury." *Commonwealth v. Carroll*, 936 A.2d 1148, 1151 (Pa. Super. 2007) (emphasis omitted), *abrogated on other grounds by Commonwealth v. Karetny*, 880 A.2d 505 (Pa. 2005). Like the crime of reckless endangerment, a juror could find that Harvard's decision to drive with Sutton on the hood of his vehicle did not demonstrate a callous disregard for Sutton's life, but rather, was a justifiable risk to protect himself and Mazzetti.

Third, a person is guilty of simple assault if he "attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa. Cons. Stat. § 2701(a)(3). Considering the exculpatory facts, a reasonable juror could find that Harvard did not intend to put Sutton in fear of serious bodily injury. In fact, the evidence suggests that Harvard attempted to de-escalate the situation to avoid causing harm to Sutton. For example, after Sutton jumped onto the hood, Harvard slowed his vehicle multiple times and asked Sutton to remove himself from the hood, yet Sutton refused. Further, Sutton, not Harvard, continued his aggressive and threatening behavior towards Harvard and Mazzetti. Also, Harvard followed the

911 operator's instructions to get off the highway at a particular exit, where law enforcement would be waiting. Accordingly, a reasonable juror could find that Harvard did not have the requisite intent for simple assault.

Fourth, a person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another." 18 Pa. Cons. Stat. § 2702(a)(1). Because a reasonable juror could find a lack of probable cause for simple assault, we similarly find that a reasonable juror could find a lack of probable cause for the more serious crime of aggravated assault.

Fifth, a person is guilty of disorderly conduct if he acts "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof" and "creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa. Cons. Stat. § 5503(a)(4). As discussed for the above crimes, a juror could find that the evidence available to Cesnalis showed that Harvard drove with Sutton on the hood of his vehicle because he feared for the safety of himself and Mazzetti, not because he intended to cause public inconvenience, annoyance or alarm. Accordingly, we conclude that a reasonable juror could find that there was no probable cause for disorderly conduct.

Finally, sixth, a person is guilty of driving under the influence if he was "under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle." 75 Pa. Cons. Stat. § 3802(d)(2). For the DUI charge, Cesnalis determined there was probable cause to arrest Harvard because he smelled alcohol on Harvard's breath and because Harvard was sweaty

15

and speaking rapidly.[4]  Although we must consider these observations as part of our probable cause inquiry, we must consider them in the light most favorable to Harvard.  *See Dempsey*, 834 F.3d at 468.  Here, a juror could find that a reasonable officer would have interpreted Harvard's sweaty appearance and rapid speech as a natural reaction to the traumatic events he had just experienced.  Indeed, Cesnalis testified during his deposition that Harvard's rapid speech and sweaty appearance was likely a result of this recent trauma.  Further, although Cesnalis smelled a moderate amount of alcohol on Harvard's breath, Harvard informed Cesnalis that he had consumed two beers four hours before the incident, which is consistent with the results of the Breathalyzer test indicating that his BAC was below the legal limit.  Under Pennsylvania law, a person's BAC need not be above the legal limit for a DUI charge, however, we note that Cesnalis could observe that Harvard was a large man.  Standing 5 feet 10 inches tall and weighing 345 pounds at the time of arrest, a juror could find that it was unreasonable for Cesnalis to believe that two beers consumed four hours beforehand could render Harvard incapable of safely operating his vehicle.

Based on the information Cesnalis knew at the time of arrest and the horrific events Harvard had just experienced, a juror could find that Cesnalis did not have probable cause to arrest Harvard for DUI.  Thus, we conclude that the District

---

[4] Cesnalis arrested Harvard before Beatty conducted the DRE, and therefore the information within Beatty's report cannot be considered in evaluating the false arrest claim.  *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (holding that probable cause is assessed in relation to the facts possessed by the arresting officer at the time he made the warrantless arrest).

Court erred in determining, as a matter of law, that Cesnalis had probable cause to arrest Harvard for the crime of DUI.

Accordingly, we will vacate the District Court's grant of summary judgment for Cesnalis as to the false arrest claim.[5]

## B. False Imprisonment

"[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995). "To state a claim for false imprisonment, a plaintiff must establish: (1) that [he] was detained; and (2) that the detention was unlawful." *James*, 700 F.3d at 682-83. Like his arrest, Harvard argues that he was imprisoned without probable cause. Specifically, Harvard alleges that he was unlawfully detained at the police barracks, where defendant Beatty required him to undergo a series of tests, and was later transported to the Allegheny County Jail, where he was imprisoned.

Our probable cause analysis for false imprisonment is largely the same as our probable cause analysis for false arrest. Because a juror could find that Cesnalis lacked probable cause to arrest Harvard, it follows that a juror could "find that [Harvard] suffered a violation of his constitutional rights by virtue of his detention pursuant to that arrest." *Groman*, 47 F.3d at 636. The only addition to our probable cause inquiry under false imprisonment is Beatty's drug evaluation. Beatty conducted a DRE, in which he concluded that Harvard was

---

[5] Because Beatty was not involved in Harvard's arrest, we will affirm the District Court's grant of summary judgment for Beatty on the false arrest claim.

17

"under the influence of CNS Depressants and CNS Stimulants," which "impaired his ability to safely drive, operate or be in actual physical control of a motor vehicle." App. 545-46. Although this could be enough to support probable cause on a DUI charge, his evaluation relied on erroneous and incomplete information provided by Cesnalis. Cesnalis informed Beatty that Harvard had driven on the highway with a man on the hood of his vehicle but did not provide any other context for Harvard's actions, including Sutton's alleged threatening and violent behavior. Further, Cesnalis told Beatty that Sutton saw Harvard smoking crack cocaine while driving, a fact unsupported anywhere else in the record. Beatty then relied on this unverified, incomplete information from an unreliable source to draw inferences about Harvard's potential drug use. Because Beatty's DRE was based on incomplete and potentially falsified information, a juror could find that the DRE was unreliable and therefore should not be considered in determining probable cause. Thus, we will not consider Beatty's evaluation as part of our probable cause inquiry for false imprisonment and conclude that a juror could find that Cesnalis unlawfully detained Harvard.

Accordingly, we will vacate the District Court's grant of summary judgment for Cesnalis as to the false imprisonment claim. We will affirm the District Court's grant of summary judgment for Beatty on the false imprisonment claim because his DRE, and thus his role in the detention, was based on Cesnalis's incomplete and potentially falsified information.

### C.    Malicious Prosecution

To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without

18

probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). Harvard argues that the defendants unlawfully initiated criminal proceedings against him by "knowingly providing false and misleading evidence to prosecuting authorities." Appellant Br. 30. The defendants argue that the malicious prosecution claim fails because the criminal proceedings were initiated with probable cause. We will address each requirement in turn.

For the first prong, Cesnalis initiated a criminal proceeding against Harvard when he arrested Harvard without a warrant and then submitted an affidavit of probable cause to the magistrate judge as part of the criminal complaint charging Harvard with six different crimes. *See* Pa. R. Crim. Pro. 502. In his affidavit, Cesnalis requested that Harvard "come before [the magistrate judge's] court to answer to the [] charges." App. 133. Second, these proceedings ended in Harvard's favor. The DUI charge was dismissed after the preliminary hearing, and Harvard was found not guilty on the remaining charges. Third, a reasonable juror could find that there was a lack of probable cause for the criminal proceedings initiated against Harvard. We reach this conclusion for the same reasons discussed above in our probable cause inquiry for false arrest and false imprisonment.

Fourth, we must determine whether a reasonable juror could, viewing the facts in the light most favorable to Harvard, find that the defendants acted with malice or for a purpose other than bringing Harvard to justice. Considering Cesnalis's behavior, the answer is yes. Cesnalis mischaracterized the

19

events and chose to omit crucial exculpatory information in the affidavit of probable cause he submitted to the magistrate judge. [6] In the affidavit, Cesnalis consistently referred to

---

[6] In the affidavit, Cesnalis described the incident as follows:

This incident occurred at 756 McKinley St Harwick PA, Springdale Twp Allegheny County when the victim related that his girlfriend and the DEFENDANT were in his 2002 Ford Explorer already driving through the yard at 756 McKinley. The VICTIM related that he ran out into the yard in front of the vehicle and that is when the DEFENDANT hit the VICTIM with his vehicle. The VICITM [sic] then landed onto the hood of the vehicle and the DEFENDANT continued to drive through the yard. The VICTIM then stated that he was hanging onto the hood of the vehicle for his life because the DEFENDANT wouldn't stop the vehicle. The DEFENDANT then drove through Springdale Twp into Harmar Twp down towards the river and got onto Freeport Rd and continued South on Freeport Rd through HARMAR Twp and made a right onto SR 910 and traveled onto Exit 11 on Ramp to travel North on SR 28. Then DEFENDANT then begin to travel at a high rate of speed on SR 28 as the victim was holding on for dear life and that is when the windshield wipers were ripped off the vehicle. The DEFENDANT drove North on SR 28 through Harmar Twp, Springdale Twp, Frazer Twp, East Deer Twp, Tarentum Borough, Fawn Twp, into

20

Sutton as "the victim" and entirely credited Sutton's statements. Cesnalis did not mention any of the credibility issues with Sutton's version of events, namely, that he knew Sutton had a criminal history, that Sutton had no visible injuries, or that his version of events was incredible on its face. Moreover, Cesnalis indicated that he believed Sutton's statement because of Harvard's "reputation for criminal activity," even though there is no evidence in the record to support this accusation. App. 132. Cesnalis also misrepresented the facts to make it seem as though Harvard had to be stopped by law enforcement, despite knowing that Harvard called 911 because he feared for his safety and that

> Harrsion Twp where the DEFENDANT was stopped by local police. That is when the VICTIM got off the vehicle and was placed into the rear of a Harrison Twp police vehicle and the DEFENDANT was standing on Burtner Rd upon my arrival.
>
> After the DEFENDANT was on station Trooper Daniel BEATTY performed a DRE evaluation which determined that the DEFENDANT was under the influence of a controlled substance.
> It is this affiant's opinion that the defendant, Dwayne Milton HARVARD was under the influence of an [sic] controlled substance and due to the fact that the DEFENDANT did travel on the SR 28 with the VICITM [sic] on his hood of vehicle. Therefore, I request that the defendant come before your court to answer to the following charges being brought against him.

App. 133.

Harvard followed the 911 operator's instructions to get off the highway at a particular exit where police would be waiting. Furthermore, Cesnalis did not include any relevant exculpatory facts, including Harvard and Mazzetti's consistent statements that Sutton was violent and aggressive and threatened them with a cinderblock and knife, or that Harvard slowed his vehicle multiple times in order to allow Sutton to remove himself from the hood. Cesnalis also omitted any reference to the results of Harvard's Breathalyzer tests.

A juror could find that Cesnalis omitted crucial information from the affidavit and misrepresented the facts in order to portray Sutton as the victim and Harvard as the criminal. A juror could further find that no reasonable officer would omit such crucial information, which, as discussed above, creates serious doubts as to whether Harvard had the requisite mental state for the crimes charged. Cesnalis has offered no explanation for why he chose to credit Sutton's statements over Harvard and Mazzetti's statements, and we can think of no valid reason for why Cesnalis would include such grave misrepresentations and falsehoods in the affidavit. For these reasons, we conclude that a juror could find that Cesnalis initiated proceedings against Harvard maliciously or for a reason other than bringing him to justice.

Finally, for the fifth prong, Harvard was detained in Allegheny County Jail, and therefore suffered "post-indictment restrictions placed on [Harvard's] liberty [that] constituted a seizure." *Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002).

22

Accordingly, we will vacate the District Court's grant of summary judgment for Cesnalis as to the malicious prosecution claim.[7]

## D.     Equal Protection

Harvard argues that the District Court erred in granting summary judgment for the defendants on his Equal Protection claim.    Harvard brings a selective enforcement claim, contending that he was treated differently because of his race. Specifically, Harvard asserts that Sutton, a White male, was not arrested or charged with any crimes despite his violent and aggressive behavior and yet Harvard, a Black male, was unlawfully arrested, imprisoned, and charged despite being the victim of Sutton's unlawful behavior.

To establish a selective enforcement claim under the Equal Protection clause of the Fourteenth Amendment, a plaintiff must demonstrate that he was (1) treated differently from other, similarly situated persons and (2) "that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right." *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) (alteration, internal quotation marks, and citation omitted).    Persons are similarly situated under the Equal Protection clause when they are alike "in all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Notably, we have held that "similarly situated" does not mean

---

[7] We will affirm the District Court's grant of summary judgment for Beatty as to the malicious prosecution claim because Harvard has not established that Beatty participated in initiating criminal proceedings against him or that Beatty acted with the requisite intent.

"identically situated." *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993). Our sister circuits have also emphasized that courts conducting the "similarly situated" inquiry "should not demand exact correlation, but should instead seek relevant similarity." *Stimmel v. Sessions*, 879 F.3d 198, 212 (6th Cir. 2018) (citation omitted); *see also Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.").

The District Court held that Harvard failed to identify a similarly situated person because he cannot "point to any caucasian drivers who drove at highway speeds with someone on the hood of the vehicle, but were not charged with crimes." App. 12. We find this definition of "similarly situated" overly restrictive. The District Court's application of "similarly situated" essentially requires that the comparator be identically situated to Harvard for the Equal Protection claim to succeed. We have previously rejected this requirement and do so again here. *See Bennun*, 941 F.2d at 178.

Requiring a valid comparator to have taken the exact same actions as the plaintiff would effectively bar equal protection claims in unique situations such as this. Cesnalis noted that he had never encountered such a strange situation during his time as a police officer, and we note that it would be almost impossible for a plaintiff to identify an identically situated person in a situation such as this. Instead, we must reframe the question not as whether the two individuals' actions were identical, but whether a juror, "looking objectively at the incidents, would think them roughly equivalent and the

24

protagonists similarly situated." *Barrington Cove*, 246 F.3d at 8.

Here, Harvard and Sutton's actions occurred during the same incident and could therefore be easily compared side-by-side. Indeed, Cesnalis had the opportunity to do just that when he interviewed Harvard and Sutton at the same time in the same location. Cesnalis also had evidence that both Sutton and Harvard engaged in behavior that threatened the safety of another person. At a minimum, Harvard and Sutton each alleged that the other person was engaged in violent behavior and wielded dangerous weapons: Harvard alleged that Sutton attempted to throw a cinder block towards him, jumped onto Harvard's vehicle while holding a large kitchen knife and threatened to kill him, and possessed a firearm; and Sutton alleged that Harvard struck him with his vehicle. Viewing Sutton and Harvard as two persons who engaged in allegedly threatening and violent behavior with a dangerous weapon, whose actions occurred during the same incident, and whose actions (if true) could potentially give rise to similar criminal charges, we find that a reasonable juror could determine they are similarly situated.

A juror could also find that there was no rational basis for disparate treatment towards Harvard except upon the basis of Harvard's race. Cesnalis chose to ignore overwhelming evidence that Sutton was the aggressor who acted unlawfully in this situation and decided to credit Sutton's incredible statements. According to Harvard, Cesnalis repeatedly referred to Harvard as "boy" while demanding that Harvard complete a Breathalyzer test. App. 46 ("You understand me boy, I want you to blow into the Breathalyzer." (emphasis omitted)). Harvard was 46 years old at the time of the incident. Because of the long history of "boy" as a slur against Black

men, a juror could, under the circumstances, interpret this term as evidence of racial animus. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (noting that use of the term "boy" was a potential indicator of racial animus). Cesnalis also insinuated that Harvard had been smoking crack cocaine even though there is no evidence whatsoever in the record to support this accusation. A juror could find that this is further evidence of racial animus based on the historical associations of crack cocaine use with Black communities. *See* Richard Dvorak, *Cracking the Code: "De-Coding" Colorblind Slurs During the Congressional Crack Cocaine Debates*, 5 MICH. J. RACE & L. 611, 648 (2000) (discussing how this association with Black communities contributed to the controversial federal crack cocaine legislation of the 1980s). This underlying racial animus is further corroborated by Cesnalis's affidavit of probable cause, in which he consistently referred to Sutton as "the victim." Cesnalis's deliberate omissions from the affidavit and potentially falsified information suggesting that Harvard had a prior criminal history all lend support to Harvard's allegation that Cesnalis's actions were motivated by a prohibited reason, in this case, racial animus.

A juror could find that Cesnalis's racial slurs against Harvard, combined with his unreasonable decision to credit Sutton's testimony and omit vital exculpatory facts from the affidavit, indicate that Cesnalis's actions were racially motivated. Accordingly, we will vacate the District Court's grant of summary judgment for Cesnalis as to Harvard's Equal Protection claim.[8]

---

[8] Harvard has not demonstrated that Beatty was involved in this disparate treatment. Thus, we will affirm the District Court's

### E.    Reckless Investigation

Harvard argues that the District Court erred in granting summary judgment for the defendants on the reckless investigation claim.  Harvard asserts that his rights under the Fourteenth Amendment were violated because the officers intentionally chose not to investigate Sutton's violent attack against Harvard.

We have never recognized an independent due process right to be free from a reckless investigation.  *See Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018) (expressing "doubts" as to the viability of a reckless investigation claim).  We have also held that, even if such a claim were cognizable, it "could only arise under the Fourth Amendment."  *Id.*  We will therefore affirm the District Court's grant of summary judgment for the defendants as to the reckless investigation claim.[9]

### F.    Civil Conspiracy

---

grant of summary judgment for Beatty on the Equal Protection claim.

[9] Even if Harvard had brought the reckless investigation claim under the Fourth Amendment, the officers would nevertheless be entitled to qualified immunity because this right was not clearly established at the time of the investigation.  *See id.* ("Whatever doubts we may harbor as to the viability of such a [reckless investigation] claim, however, we have no occasion to resolve them today.  First, no such constitutional right was 'clearly established' at the relevant time, as required to overcome qualified immunity." (citations omitted)).

27

Harvard argues that the District Court erred in granting summary judgment for the defendants for his civil conspiracy claim. "To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (internal quotation marks and citation omitted). This requires that the state actors took "concerted action" based on an "agreement" to deprive the plaintiff of his constitutional rights, and that there was an actual underlying constitutional violation of the plaintiff's rights. *Id.* at 295.

The District Court granted summary judgment because it determined there was no underlying violation of Harvard's constitutional rights. Although we conclude that a jury could determine that Harvard's constitutional rights were violated, Harvard has not demonstrated that Cesnalis and Beatty agreed to deprive him of his constitutional rights. According to Harvard, Cesnalis's suspicion that Harvard was under the influence led Beatty to subject Harvard to a series of tests to confirm that suspicion. But, as discussed above, Beatty's involvement in this case was limited to performing the DRE and his evaluation was based on inaccurate and incomplete information supplied by Cesnalis. There is no indication that Beatty knew about Cesnalis's misrepresentations or that he entered into an understanding with Cesnalis to falsely conclude that Harvard was under the influence.[10] Accordingly, we will

---

[10] Harvard also argues that Beatty furthered the conspiracy when he "contrived a story" that Mazzetti was a prostitute and that she was trying to steal Harvard's money. Appellant Br. 35. Even if Beatty did fabricate this story, this took place after Harvard's criminal case was terminated and the charges were dismissed. Therefore, it does not support Harvard's claim that

28

affirm the District Court's grant of summary judgment for the defendants as to the civil conspiracy claim.

## IV. CONCLUSION

For the foregoing reasons, we will vacate the District Court's grant of summary judgment for Cesnalis as to the false arrest, false imprisonment, malicious prosecution and Equal Protection claims. We will affirm the District Court's grant of summary judgment for Cesnalis on the reckless investigation and civil conspiracy claims. We will affirm the District Court's grant of summary judgment for Beatty on all claims.

---

Cesnalis and Beatty conspired to deprive him of his constitutional rights.