**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THIRD CIRCUIT

———————

No. 25-2240

———————

RICHARD THIVENER,
                              Appellant

v.

ANDREW NERO, PETER LARGEY, THOMAS NICKLAS,
GREGG MCMANUS, PHILIP HOH, MICHELLE MUCCIO,
THOMAS COPPOLO, ANTHONY PISTNER, COUNTY OF ELK

———————

Appeal from United States District Court
for the Western District of Pennsylvania
(District Court No. 1:22-cv-00238)
District Judge:  Honorable Cathy Bissoon

———————

Submitted under Third Circuit L.A.R. 34.1(a)
March 26, 2026

Before: HARDIMAN, SCIRICA, and AMBRO, <u>Circuit Judges</u>

(Opinion filed: April 29, 2026)

_____

OPINION[*]

_____

AMBRO, Circuit Judge

The District Attorney's Office in Elk County, Pennsylvania charged Richard Thivener with homicide, drug delivery resulting in death, and reckless endangerment after he confessed to killing his wife, Jessica Thivener. Its Court of Common Pleas suppressed the evidence of his confession and dismissed the charges without prejudice. Thivener brought this action against the state officials responsible for investigating and prosecuting him. His complaint alleges that officers unlawfully coerced his confession, seized evidence from his home in violation of the Fourth Amendment, and arrested and charged him without probable cause. The United States District Court for the Western District of Pennsylvania granted summary judgment for the defendants on all claims. Thivener appealed. For the reasons that follow, we affirm.

I

In the early morning hours of July 26, 2020, Thivener sent a text message to Wendy Catalano—the mother of his wife, Jessica—stating that "Jess[ica] and I have committed suicide together." App. 543a. The message instructed Catalano to "come find us before the kids wake up." _Id_. Catalano rushed to the Thiveners' home. When she arrived, she

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

discovered her daughter's lifeless body on the bed in the master bedroom. She was fully naked except for a bra that was pulled up, revealing her breasts. Her legs were spread open, her underwear was on the floor, and two bottles of sexual lubricant were next to the bed where Jessica lay. She had spots of blood and lubricant on her body. Thivener was still alive, laying on the bed next to Jessica's body. Catalano called the police.

Chief Thomas Nicklas and Sergeant Peter Largey of the City of St. Mary's Police Department responded to the call. Chief Nicklas remained near the home's front door to monitor who entered and left while Sergeant Largey went to the master bedroom. The latter testified that he observed Thivener "laying on his side" with his eyes closed, and that he would "periodically" open them to "glar[e]" at Jessica. App. 594a. EMS personnel arrived shortly thereafter to treat Thivener. He was generally non-responsive to their questions, stating only that he had taken "medicine" that night. App. 619a. They removed him from the bedroom and took him to the hospital.

Sergeant Largey called Patrolman Andrew Nero to process the scene. When Nero arrived, he and Largey disagreed about whether they should seek a warrant before searching the home. Nero testified that their "focus" at that point was to determine which medications Thivener had taken that night so they could give the information to the medical professionals treating him. App. 627a. The officers called Elk County District Attorney Thomas Coppolo to ask how they should proceed. He told them to "process the scene." App. 497, 4056. The officers understood this to mean that a warrant was not necessary.

3

They proceeded to search the home for medications. They also took photographs of the scene and seized three electronic devices.[1]

Sergeant Largey assigned Officer Christopher Smith the task of interviewing Thivener at the hospital. He was drifting in and out of sleep during the conversation, and told Smith that he "failed," apparently referencing his suicide attempt. App. 770a. Thivener explained that he and Jessica had taken Ativan and Xanax and consumed several alcoholic beverages. He specifically stated that Jessica drank gin, wine, and Mike's Hard Lemonade. But toxicology results showed that Jessica had no alcohol in her blood that night, and that the amounts of Ativan and Xanax in her blood were not above therapeutic levels. The medical examiner listed her cause of death as "cardiac dysrhythmia of undetermined etiology." App. 2105a. And the examiner indicated that the manner of Jessica's death "could not be determined." App. 2121a.

The police obtained a warrant to search Thivener's phone. It revealed that, in the days leading up to Jessica's death, Thivener's internet searches included: "in order to rule a case a suicide, investigators must be able to prove the death is[]," "proving suicide," "proving my wife killed herself," "if someone kills themselves because of you can you go to jail," "if my wife and I voluntarily kill each other," "manslaughter sentence in pa," "manslaughter degrees," "homicide," "assisted suicide and life insurance," "how long will you be in psych for failed suicide," "will 15 mg of [A]tivan kill me," "does [A]tivan taste bad," "can [A]tivan make you vomit," and "4 minutes without oxygen." App. 1128a–

---

[1] The officers seized Jessica's cellphone, Thivener's cellphone, and a laptop computer.

4

1156a. Thivener had also downloaded a document titled "A Handbook for Survivors of Suicide." App. 1164a–99a.

The investigation also revealed evidence that Jessica had been having an affair in the months leading up to her death, and that Thivener knew about it. A man named Christian McMonigal called the St. Mary's Police Department to report that he and Jessica had been having an affair. Patrolman Nero communicated with McMonigal, who explained that Thivener found out about it in January 2020, approximately six months prior to Jessica's death. McMonigal stated that Thivener confronted Jessica and instructed her to end the affair. But it continued, which Thivener learned in May 2020, after which he confronted Jessica again. The affair continued even after the second confrontation. McMonigal explained that Jessica was afraid of Richard because he would physically, emotionally, and sexually abuse her. He stated that Thivener planned to address the affair with her again on July 25, 2020—the night of her death.

In October 2020, Thivener agreed to be interviewed by Detective Greg McManus. At the outset, McManus informed Thivener of his *Miranda* rights, who affirmed that he understood them. After nearly three hours of questioning, Thivener admitted that he placed 17 Ativan pills in Jessica's soup the night of her death without her knowledge. He conceded that the story he initially told about a suicide pact between him and Jessica was "bullshit," and that he put the pills in her soup because he was not "cool with" her communicating with McMonigal after purporting to have ended the affair. Interview Part 4 at 23:07, 29:44. Thivener also alluded to the possibility that the pills he put in Jessica's soup were

something other than Ativan, remarking at one point that he stole the pills from his workplace and thus he could not be certain they were in fact Ativan.

After Thivener confessed to killing Jessica, District Attorney Coppolo instructed Nero to "go ahead and charge" him. App. 784a–785a. Nero filed a criminal complaint charging Thivener with homicide, drug delivery resulting in death, and reckless endangerment. The Elk County Court of Common Pleas quashed the charges after suppressing evidence related to the confession and the searches of his home. It found that the Commonwealth failed to meet its burden to prove that the confession was voluntary, and that the search and seizure of evidence from Thivener's home the night of Jessica's death violated the Fourth Amendment. It then dismissed all the charges against him without prejudice.

In July 2022, Thivener brought this action in the United States District Court for the Western District of Pennsylvania. Relevant to this appeal, he asserted malicious prosecution and false arrest claims against Nero, a claim against McManus, Nero, and another St. Mary's police officer, Anthony Pistner, for coercing his confession, and several claims against Nero and Largey for unreasonably searching his home and seizing evidence in violation of the Fourth Amendment. The District Court granted summary judgment for the defendants on all claims, and Thivener appealed.

II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo. *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021). We must affirm if

6

there is "no genuine dispute as to any material fact and the [defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### The Malicious Prosecution and False Arrest Claims

The existence of probable cause defeats Thivener's malicious prosecution and false arrest claims against Nero. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (explaining that a plaintiff must establish that "the arrest was made without probable cause" to prevail on a false arrest claim); *Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020) ("To prevail on a malicious prosecution claim, a plaintiff must demonstrate that . . . 'the proceeding was initiated without probable cause.'" (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). Probable cause is a "complete defense" to a false arrest claim. *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016). And it need only exist as to any offense that could be charged under the circumstances, not to every charge actually filed. *Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 303 (3d Cir. 2024). But to defeat a malicious prosecution claim, there must be probable cause as to every offense charged. *Johnson v. Knorr*, 477 F.3d 75, 84–85 (3d Cir. 2007).

Probable cause exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been . . . committed." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). At the summary judgment stage, we evaluate probable cause based on the totality of the circumstances known to the defendant-officers, and we "view those circumstances in the light most favorable to [Thivener]." *Harvard*, 973 F.3d at 200.

The officers charged him with homicide, which Pennsylvania defines as "intentionally, knowingly, recklessly, or negligently caus[ing] the death of another human being." 18 Pa. Cons. Stat. § 2501(a). The facts known to Nero at the time of Thivener's arrest were more than sufficient to establish probable cause for that offense. Jessica was found in bed, in rigor mortis, next to Richard. Her positioning was, in the officers' training and experience, inconsistent with suicide. Thivener confessed to intentionally killing Jessica by putting Ativan in her soup without her knowledge. He had access to medication through his work as a licensed practical nurse ("LPN"). Moreover, his internet searches support the inference that he had been contemplating faking a suicide pact with her to cover it up. And Thivener's knowledge of Jessica's affair provided a motive. In fact, they were supposed to discuss the affair the night Jessica died.

To challenge the existence of probable cause, Thivener points out that toxicology results show that Jessica had a non-fatal amount of Ativan in her system at the time of her death. Because the officers knew this, he argues it would have been unreasonable for them to believe his confession that he put 17 Ativan pills in Jessica's soup without her knowledge. On his telling, the toxicology results "scientific[ally] negat[ed]" his confession and, by extension, the existence of probable cause. Thivener Br. 18.

We do not agree. First, the argument ignores Thivener's admission during his interview that he could not be sure whether the pills he put in Jessica's soup were in fact Ativan. Second, and more importantly, the "probable cause standard . . . allows for the existence of conflicting, even irreconcilable, evidence." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). To be sure, the toxicology report showing that there was no lethal dose

of Ativan in Jessica's system may have proved problematic for the Commonwealth at trial. But probable cause is not proof beyond a reasonable doubt. *See also id*. at 478 ("[S]ome unreliability or exculpatory evidence will not fatally undermine probable cause otherwise established." (citation modified)). Nero's knowledge when he arrested Thivener was sufficient for a reasonable person to believe that he committed the charged offenses, even considering the exculpatory evidence. Because the charges were supported by probable cause, the District Court did not err in granting summary judgment for the defendants on the malicious prosecution and false arrest claims.[2]

The Coerced Confession Claims

Thivener also brought a § 1983 claim against McManus, Nero, and Pistner for allegedly coercing him to make a false confession.[3] He testified that the officers made him feel that

---

[2] Thivener also argues that we must reverse on the malicious prosecution claim because the officers lacked probable cause to charge him with reckless endangerment and drug delivery resulting in death. Indeed, the existence of probable cause for one charge does not automatically defeat malicious prosecution claims based on other charges. *See Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 562–564. But the officers had probable cause for those additional charges as well. A person commits reckless endangerment when he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury," 18 Pa. Cons. Stat. § 2705, and drug delivery resulting in death when he "intentionally administers . . . any controlled substance . . . and another person dies as a result of using the substance." 18 Pa. Cons. Stat. § 2506(a). Confessing to intentionally causing a person to consume a fatal amount of Ativan (or another unknown drug), when viewed in the totality of the circumstances, supplies probable cause for either charged offense.

[3] Thivener purports to bring these claims under the Fourth and Fourteenth Amendment rights "to liberty and to be free from governmental restraints on personal movement and freedom." App. 75a. This claim is likely more appropriately framed as a violation of the Due Process Clause of the Fourteenth Amendment. *See Halsey v. Pfeiffer*,750 F.3d 273, 303 (3d Cir. 2014) (characterizing a coercion claim as premised on the allegation that defendants "denied [plaintiff] due process of law"). Because we hold that Thivener has

9

"they were already going to arrest me and put me in jail for this, and that if I gave them something, that they would be more lenient." App. 932a. He argues that the officers used several "coercive techniques" to make him feel that way. Thivener Br. 32. And he also notes that he has autism spectrum disorder, which he says makes him more susceptible to those tactics.

Our inquiry focuses on whether the confession was "the product of a free will." *Brown v. Illinois*, 422 U.S. 590, 603 (1975). We consider the totality of the circumstances, including "the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused." *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986) (quoting *Rachlin v. U.S.*, 723 F.2d 1373, 1377 (8th Cir. 1983)).

Applying this standard, we conclude that no reasonable juror could find that McManus, Nero, or Pistner coerced Thivener's confession. At the time of the interview, Thivener was 37 years old. He graduated high school in 2001, obtained his EMT certification, graduated nursing school in 2007, worked full-time as an LPN, and parented his two biological children and stepdaughter. Moreover, McManus recited Thivener's *Miranda* rights before questioning began, and Thivener acknowledged that he understood them. He also testified that he understood his rights during the interrogation. Whether Thivener was advised of his *Miranda* rights is relevant, but it "does not automatically mean that any subsequent confession is voluntary." *Halsey v. Pfeiffer*, 750 F.3d 273, 304 (3d Cir. 2014) (citation modified); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (noting that "the

___

failed to show a genuine dispute of material fact as to whether his confession was coerced, we need not address whether he may bring his claim under the rights he articulated.

10

lack of any advice to the accused of his constitutional rights" bears on whether an interviewee's "will was overborne in a particular case"). Thivener never indicated that he wanted a lawyer during questioning. And he does not allege that the officers physically assaulted him or threatened his safety.

The interview lasted approximately four and a half hours, from 4:03 p.m. to 8:38 p.m. Thivener was provided with water, the interview was punctuated with breaks, and when he requested to use the restroom, law enforcement immediately acquiesced. This is unlike cases where we have found that a plaintiff's will was overborne by a coercive interview. *See Halsey*, 750 F.3d at 306 (holding that a reasonable factfinder could find that a confession was coerced when "[o]ver the course of less than two days, [law enforcement] detained [the plaintiff], a man of limited intelligence and little education, who was unaccompanied by a friend or an attorney, for about 30 hours and questioned him almost continuously for about 17 of those hours, of which about nine were highly confrontational").

Thivener argues instead that the officers violated his rights by using coercive psychological tactics. Brian Leslie, a "coercive interrogation [and] interview expert," App. 4876a, reviewed the interview footage and determined that the officers overstated the strength of their case, understated the consequences Thivener could face for confessing, and fed specific words and phrases to him through "structured suggestive questioning," App. 4903a, to induce him into a state of "confession compliance," which Leslie defines as when "a suspect concedes to the interviewer's suggested narrative by the overwhelming

11

use of coercive methods." App. 4910a. Alan Hirsch, a professor who studies false confessions, reviewed the footage and reached similar conclusions.

While these findings may create a dispute of fact at trial, it is not a material one in this constitutional context. "[A] confession is not rendered involuntary simply because the police procured it by using psychological tactics." *Halsey*, 750 F.3d at 304. And "even the use of deception to procure a confession," without more, does not necessarily violate the Constitution in this context. *See id.*; *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that "[t]he fact that the police misrepresented" facts is "insufficient" on its own to demonstrate a constitutional violation); *U.S. v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits . . . .").

Thivener's autism diagnosis does not compel a different result. We are sensitive that individuals with autism may be more susceptible to giving false confessions. Laurie Sperry, an expert Thivener hired on the topic, concluded the officers failed to conform to best practices for interviewing people with autism by not allowing "a comfort person or facilitator to be present," not allowing Thivener to "repeat back, in [his] own words, [his] understanding of the questions being asked," using double negatives and figures of speech, asking questions too quickly, and not permitting enough breaks.[4] App. 5449a.

But a coercion claim does not turn on whether an officer's conduct conforms to that list of best practices. An officer can persistently question a suspect in an abrasive tone without

---

[4] Sperry states that she takes these best practices from a document published by the Department of Justice in 2011. She does not provide a citation to that document.

violating the Constitution. The video footage of Thivener's interview shows that he agreed to be interviewed by the police and admitted to killing his wife after the officers confronted him with contradictions in his account of the circumstances surrounding Jessica's death. The officers' interviewing style, although confrontational at times, does not establish a constitutional violation in this context. The totality of the circumstances does not reasonably permit the conclusion that Thivener's will was overborne when he confessed. The District Court thus did not err in granting summary judgment for the defendants on Thivener's coercion claim.

### The Unreasonable Search and Seizure Claims

Thivener asserted various Fourth Amendment claims against the officers who searched his home the night of Jessica's death. On appeal, he seeks review of the ones he asserts against Sergeant Largey and Patrolman Nero for entering his home, taking photographs, and seizing electronic devices and medications.[5] The District Court found the officers were entitled to qualified immunity on these claims.

Qualified immunity is accorded an officer unless he (1) "violated a federal statutory or constitutional right" and (2) "the unlawfulness of [his] conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v.*

---

[5] In the argument section of his brief, Thivener also asserts that Chief Nicklas unlawfully searched his home. But he did not raise his claim against Nicklas in his Statement of the Issues before us. And even without a forfeiture of his arguments as to Nicklas, Thivener's claim would still fail because there is no evidence that he participated in the searches or seizures of the home. While Nicklas indeed joined Sergeant Largey in responding to the 911 call that night, Thivener does not describe any unlawful conduct, other than a reference in passing, to Nicklas's search of the home.

*Howards*, 566 U.S. 658, 664 (2012)). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *Id*. at 63 (cleaned up).

Sergeant Largey and Patrolman Nero searched Thivener's home without a warrant. Unless they can fit their search and seizures under an exception to the warrant requirement, their actions were presumed unlawful. *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) ("Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies.").

The officers' search, however, fits the exigent circumstances exception to the warrant requirement. To repeat, Nero testified that their "focus" when they entered the home was to determine which medications Thivener had taken earlier that night so they could give that information to the medical professionals treating him. App. 627a. Officers "may enter private property without a warrant when certain exigent circumstances exist, including the need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (cleaned up). In this case, the officers had reason to believe Thivener had attempted suicide and needed to determine what he had ingested in order to assist with his treatment. Their entry into the home to search for medications was thus reasonable.

Moreover, the seizure of electronic devices was lawful under the "plain view" exception to the warrant requirement. *See United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (explaining that officers may "seize incriminating evidence in plain view" during a search).

14

Nero seized Jessica's cellphone,[6] Thivener's cellphone, and a Chromebook computer. Thivener does not dispute these items were in plain view when seized. Instead, he argues the exception does not apply because the incriminating character of the evidence was not "immediately apparent." *Id*. We disagree.

Nero testified that he saw Jessica's cellphone on the floor of the bedroom near the foot of Jessica's body and that he saw a notification on the screen of Jessica's cellphone stating that someone attempted to log into the account for "Jcatalano06," App. 634a, which he surmised was Jessica's account based on context, from a Chrome device. And he observed a Lenovo Chromebook laptop computer on the other side of the bed. Nero could thus reasonably suspect that Thivener may have attempted to access Jessica's account using the laptop at or around the time of her death. Collecting both devices would allow him to confirm that theory and to piece together a timeline of Thivener's actions on the night of Jessica's death. Moreover, Jessica's mother, Wendy Catalano, told the officers that she received a text message from Thivener earlier that night stating that he and Jessica committed suicide. Thus, when Nero observed Thivener's cellphone on a bench outside the front door of the house, he had reason to suspect that searching it could yield evidence in the investigation. The incriminating character of all three devices would have been apparent to a reasonable officer in Nero's shoes.

---

[6] As a threshold matter, Thivener lacks standing to contest the search of Jessica's phone. *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000), *as amended* (Sept. 21, 2000). The seizure of her phone could not have violated his Fourth Amendment rights.

Taking into account the exigent circumstances and the incriminating character of the evidence in plain view, we conclude that neither Nero nor Largey acted contrary to the clearly established boundaries of lawful conduct under the Fourth Amendment. The District Court was thus correct to grant them qualified immunity.

\* \* \* \* \*

The District Court did not err in granting summary judgment for the defendants on Thivener's malicious prosecution, false arrest, and coerced confession claims. Nor did it err in granting qualified immunity to them on his Fourth Amendment claims. Accordingly, we affirm.